Argued October 22; affirmed December 24, 1929

## AL HOPKINS ET AL. *v.* H. HOWARD ET AL.

(283 Pac. 18)

For appellant there was a brief over the names of *Mr. Gus Newbury* and *Mr. W. J. Moore* with an oral argument by *Mr. Newbury.*

For respondents there was a brief over the name of *Messrs. Briggs & Briggs* with oral arguments by *Mr. F. J. Newman* and *Mr. E. D. Briggs.*

McBRIDE, J.   This is a suit to restrain the erection of a play-shed in School District No. 60 of Jackson county, Oregon.   The pleadings are long, but the contentions of the parties can be easily stated in the opinion.   The beginning of this controversy may be dated from a notice given by the directors of a special school meeting, which notice is as follows:

"SPECIAL SCHOOL MEETING.

"Notice is hereby given to the legal voters of School District No. 60, of Jackson County, State of Oregon, that a special school meeting of said district will be held at Upper School on the 29th day of August, 1927, at 2 o'clock in the afternoon, for the following objects:

"To vote a new school house and a regular high school for the Upper Soda Springs school.

"Dated this 6th day of August 1927.

"H. Howard,
"Chairman of Directors.

"Attest: Amos E. Williams,
"District Clerk."

No contention is made as to the form of the notice, or as to the legality of any of the proceedings leading up to the meeting.   The meeting was held pursuant to this notice, and a vote was taken on the question of a high school in the district, the proposition being defeated by a vote of 10 in favor of the high school and 17 against it.   Thereafter, it was proposed at the meeting that a play-shed be built for the school, and the school superintendent being present was questioned as to the legality of voting for a play-shed at the special meeting and seems to have advised the meeting that in her opinion such a vote was ineffective, because it was not within the matters mentioned in the call for the special meeting.   At this point there seems to be some divergence in the testimony, plaintiff claiming

that some one proposed a straw vote on the subject, and that upon that vote it was the sense of the meeting that a play-shed should be built which was indicated by a vote of 16 in favor of building it and 12 opposed, and that nothing further was done. The defendants, on the other hand, contend that a motion was made to the effect that the meeting take a vote on the question of building a play-shed, and that this being decided in the affirmative the meeting then proceeded to take a vote whereby the proposition was carried by a vote of 16 to 12, there being present at the meeting 28 voters in all. Thereupon the chairman called the three directors together and a majority of them in a meeting decided that bids should be advertised for the construction of a play-shed. Thereafter plans and specifications for a play-shed 20 x 44 feet in size were prepared and submitted to the county superintendent for her approval and duly approved by her. Thereupon notice was published calling for bids and the bid of Sherman Powell, being the lowest bidder, was on the 21st day of September accepted, and he proceeded immediately to the prosecution of the work. On October 11, 1927, when the building was more than half completed, and most of the material was on the ground, the plaintiff brought this suit in behalf of himself, and other similarly situated, to enjoin the construction of the play-shed, and a temporary injunction was issued.

In this suit the plaintiff practically makes four claims, or, rather, gives four reasons why the injunction should be granted. First, he contends that the meeting called on August 29 could not legally authorize the construction of a play-shed, because such object was not named in the notice calling the meeting. Second, he claims that the district did not own the land

on which the play-shed was proposed to be erected, or the ground on which the present schoolhouse stands. Third, he claims that under the guise of erecting the play-shed the defendants are in fact building a schoolhouse and intend to use it for such purpose. Fourth, he claims that the directors have no power, except by vote of the district, to build a play-shed and that therefore the whole proceeding is void.

■■ Taking up these reasons in the order stated, we are of the opinion that the meeting was not authorized to vote for the erection of a play-shed on August 29, there being nothing in the notice calling for action upon that subject, and, therefore, the question, whether the vote taken at that time was intended to give actual authority to the directors to build a play-shed or was merely intended to ascertain the general sentiment of the people in regard to it, is immaterial. Beyond its moral effect on the minds of the directors, the vote had no validity and can not be invoked to justify or authorize their action. But we are of the opinion that independent of any direction by vote of the district, so long as the district had not prohibited their action, they had a right to use the funds of the district for the construction of a play-shed, if such a building was necessary, and to the extent that the requirements for such a building would reasonably seem to be necessary.

The testimony in this case calls to the minds of the writer of this opinion conditions, which generally prevailed in the primitive Oregon country 70 years ago, excepting that in that case the hardships attending the carrying on of a district school in the winter seemed to be greater than they were in the remote period, where, within the writer's own recollection and experience, children not unfrequently rode four or five miles

through mud, rain and snow to attend the district school and tied their horses to trees to shiver in the rain while they huddled around the school stove or fireplace to warm and dry themselves, and not unfrequently were compelled to remain there during the noon recess and through intermissions on account of the inclemency of the weather. In this particular there are two schoolhouses in School District No. 60, one known as the Lower Soda Spring school situated at a comparatively low altitude and the other six miles above, located at an altitude of 3,800 feet above sea level, known as Upper Soda Spring school. It stands to reason, and is shown by the testimony, that at that altitude in the Cascade mountains much snow and rain falls in the winter; that the population is sparse; that some of the children have to come on horseback to attend school; that the ground in winter is soft, muddy and sticky, being sort of a clay or adobe formation, and every condition would seem to indicate a necessity for some kind of a structure under which children can play and have exercise during the intermissions. In fact, this condition seems so evident and the necessity for such a building so plain, not only on account of the pleasure that the children could have at such intermission but, on account of their health, that it is a matter of wonder that any person, having children of school age, would make an objection to a reasonable provision for an obvious necessity; and we think few of them do.

In the whole school law we find provisions and restrictions in regard to the construction and repair of schoolhouses, but we find no provision requiring the erection of play-sheds nor any limitation on the authority of the directors of the school to erect such conveniences. Between the provisions, which provide a limitation on authority, and those provisions, which

impose duties, there seems to be wisely left a field which may be covered by implied powers so long as these implications are not abused.

Our school law, although it has been from time to time revised, is still more or less a patchwork, but § 5032, O. L., which is a part of the revision of 1919, and therefore the last word on the subject of the powers and duties of directors in districts of this class, is as follows:

*"Duties of Board of Directors in Second and Third Class.*

"The duties of boards of directors in second and third class school districts shall be as follows:

" (1) To arrange for public meetings at such times as they may decide for the free and orderly discussion of all questions which concern the social, moral, political and economic welfare of the community.

" (2) To secure speakers, suggest subjects and formulate the method of conducting discussions.

" (3) To provide and conduct games, dances, community dramas, musicals, motion pictures, and to promote all similar play activities with a view to increasing the joy, health and good fellowship among both adults and youths.

" (4) To provide courses of studies for young men and women as a preparation for citizenship and devise methods of organizing the youth into voluntary, cooperative and constructive forms of patriotic service.

" (5) To promote closer cooperation between the school and the home, between parents and teachers; to aim to improve the school equipment; to secure more adequate support and better housing conditions for teachers; to endeavor to provide ways and means or to remove such obstacles as may be necessary to enable all children to remain in school until they have finished the grammar grades."

We think that subdivisions 3 and 5 of this section, which imposes the duties of the directors to promote

certain activities, with a view to increasing the joy, health and good fellowship among both adults and youths, and to improve the school equipment and to provide ways and means to remove such obstacles as may be necessary to enable all children to remain in school until they have finished the grammar grades, carry with them sufficient implied authority to enable the directors to erect a play-shed to protect pupils from the inclemency of the weather, and with this implied authority and no absolute prohibition against the exercise of it, we think it is not only their right but their duty in the present instance to make adequate provisions, taking into consideration the climatic and other conditions, the size of the schoolhouse, and the financial condition of the district. Of course, such authority must be reasonably exercised and the courts would not allow the directors to incur unnecessary expense in the matter, but there is no evidence sufficient to authorize us to say that the amount to be expended in this case is extravagant and the testimony indicates that the district is out of debt and has several thousand dollars in its treasury. The evidence does not convince us that the real purpose of the directors is to build a schoolhouse under the guise of a play-shed. This is absolutely denied and there are slight indications that such an intention was contemplated.

■ Another contention is that the schoolhouse and site on which this building is to be erected do not belong to the district. The facts are that about eight years ago the present site of the district was upon an unpatented homestead, but relying upon the statement of the homesteader that he would convey the property to the district as a gift when he received full title the schoolhouse was built and has stood there ever since.

He has now obtained his title and had before this difficulty arose, and now expresses himself as perfectly willing to convey the acre of ground he promised and brings into court a recorded deed actually conveying it. Putting aside the fact that since this difficulty began he has actually tendered a conveyance, his own acts and promises would estop him from asserting any title to the premises and the contention is not worth serious attention.

■ The plaintiff here has no equities in any event. From the 29th day of August he knew that the directors contemplated the erection of this building and, while from time to time he rather objected to it, he waited until the building was more than half completed and most of the material on the ground, before bringing this action. This delay was unequitable and unfair to those parties whom we believe were acting in good faith and doing what they believed they had a right to do, and which we have found that they had a right to do.

The judgment of the circuit court will be affirmed.

AFFIRMED.

BROWN, J., absent.