Argued at Pendleton May 2; reversed July 18, 1933

## TUTTLE ET AL. *v.* BEEM ET AL.

(24 P. (2d) 12)

146

*R. J. Green,* of La Grande (Green & Hess and Charles J. Shelton, all of La Grande, on the brief), for appellants.

*Colon R. Eberhard,* of La Grande (Cochran & Eberhard, of La Grande, on the brief), for respondents Jake Beem, Verne Hug, Wilford Duncan, and Mrs. Sam Knight.

*George R. Lewis,* of Pendleton (Peterson & Lewis, of Pendleton, on the brief), for respondents Billups and Edwards.

ROSSMAN, J. This is an appeal from a decree of the circuit court dismissing the suit of the plaintiffs who are taxpayers in school district No. 41 of Union county, instituted for the purpose of securing an injunction to restrain the defendants (the school district, its officials and two individuals who are well drillers) from expending the school district's funds in payment of a claim asserted by the two well drillers.

School District No. 41, one of the defendants, is a school district of Union county, and, due to the fact that it serves only eight or nine pupils, is a third class district (§ 35-902, Oregon Code 1930). Defendants Beem, Hug, and Duncan are the directors of the district. Defendants Edwards and Billups are partners engaged in the business of well drilling. In 1931 they deepened the well upon the school premises and

the claim which they assert for their services rendered in so doing constitutes the subject-matter of this suit.

In 1923 the school district, for the purpose of securing a water supply for the school, drilled a well 90 feet deep upon the school premises. Several witnesses testified that the well in the years immediately following 1923 provided the school with an adequate supply of pure water. Witnesses also testified that the water in any well which is not in constant use becomes ·foul. Since this well was idle during the summer vacation period, the taste and color of its water, in the course of time, became the source of complaint. The teachers who served the school in the years 1928-1929 and 1929-1930 and others testified that in a part of each school year the water had a bad taste, took upon itself a strong odor and had a yellowish color. During a part of each of those two school years water was secured from other sources. The unsatisfactory condition of the well aroused the interest of the directors and they sought a remedy. The testimony indicates that whenever a well in the vicinity of the school becomes foul from insufficient use the owner cleans it. One process is constant pumping extending over a period of two or three days; another is the removal of the mud from the bottom of the well, and still another is to sink the casing a short distance farther. In their efforts to find a remedy two of the directors spoke to three well drillers, one of the three being the defendant Edwards. In the budget submitted to the voters at the 1930 annual school meeting (aggregating $1,532.50) there is no mention of the well. The notice of the election, however, stated: "Notice is hereby given that an election will be held in school district No. 41 * * * for the purpose of submitting to the legal voters of said

district the question of increasing the tax levy for the year 1930 * * *. The reasons for increasing such levy are repair work on school well indebtedness * * *''. The 1931 budget, aggregating $2,220.40, also made no mention of the well. The notice, if given, of the 1931 election to which that budget was submitted was not introduced in evidence and was not mentioned by the witnesses. The 1931 budget included an emergency item of $100. Both budgets were adopted. The testimony does not indicate directly how many voters attended those two meetings, but warrants the inference that possibly only the three directors and the clerk were present. The 1930 and 1931 budgets were composed of the following items:

| | 1930 | 1931 |
|---|---|---|
| ''Clerk | $ 50.00 | $ 50.00 |
| Legal service (clerk's bond, audit, etc.) | 12.50 | 12.50 |
| Teachers | 900.00 | 990.00 |
| Supplies (chalk, paper, etc.) | 10.00 | 10.00 |
| Text books (desk copies and indigents) | | 15.00 |
| Janitors and other employees | 45.00 | 45.00 |
| Janitor's supplies | 5.00 | 20.00 |
| Fuel | 50.00 | 30.00 |
| Repair and replacement of furniture and equipment | 25.00 | |
| Repair and maintenance of buildings and grounds | 25.00 | 25.00 |
| Insurance | 10.00 | 5.20 |
| Principal on warrants | | 850.00 |
| Interest on warrants | | 67.70 |
| Total emergency | 400.00 | |
| Emergency | | 100.00'' |

The clerk's minutes of the annual meeting held June 16, 1930, stated: ''There was a discussion as to what the board thought best to do about the well. It

was decided to have it cleaned out before the beginning of the next school term.'' The minutes of the annual meeting held June 15, 1931, stated: "A discussion about what to do with the school well was held and it was thought best to have the board meet in La Grande sometime and go see the man who does that work and try and make some arrangement about getting it cleaned out before next school term.''

Shortly after the 1931 meeting two of the directors conferred with the defendant Edwards concerning the well. September 23, 1931, these two directors and Edwards again met and signed the contract with which we are now concerned. In it Edwards and Billups agreed to drill the well deeper and the board promised to pay them for their services $3 for every foot drilled, supply the casings and provide board and lodging for Edwards and his helper. The contract stipulated that the minimum sum paid for drilling should be not less than $150. After 206 feet had been drilled a flow of water satisfactory to the board was reached and the work then stopped. Edwards and Billups thereupon presented a claim to the board for $618. The district incurred an expense of $249 for casings, and the defendant Beem presented a charge for $67.50 for the board and lodging which he had supplied to Edwards and his helper. The total of these items is $934.50. When these claims were presented the board possessed less than $100 cash. October 26, 1931, at a meeting of all three of the school directors, two of them cast votes in favor of a resolution which recited the execution of the above-mentioned contract, its performance by the drillers, and a necessity for deepening the well, and concluded: "Resolved by the directors of school district No. 41 that the said contract between said dis-

trict and said A. L. Edwards and George Billups and its execution be and the same be hereby in all things ratified and confirmed.''

When the board proposed to issue warrants in payment of the above-mentioned charges, the plaintiffs brought this suit to restrain them from so doing. They contend among other things that the board lacked authority to sign it on behalf of the district.

School districts of the third class, by virtue of section 35-908, Oregon Code 1930, are bodies corporate ''competent to transact all business coming under their jurisdiction''. The officers of the district are three directors and a clerk (§ 35-923). All regular and special meetings of the school district are convened by written call signed by the chairman of the board of directors and the clerk or by a majority of the board, stating the objects of the proposed meeting. The clerk is required to post written notices of the call in three public places ten days before the meeting. Both of these requirements are imposed by section 35-1002. District meetings have the power, by virtue of section 35-1009, to levy a tax upon all property within the district for the support of the schools and to make any necessary appropriations. This same section of our laws follows the grant of that power with these limitations:

''Provided that no tax shall be levied at any special meeting unless the call for such meeting shall have stated that one of the purposes of such meeting would be the levying of a tax; provided, further, that no tax shall be levied at any meeting unless the call for such meeting shall contain an itemized budget showing the contemplated expenditures; provided, further, that a tax levied by a district of the third class may be reviewed and lowered by the district boundary board. * * * The district or any taxpayer thereof feeling aggrieved by the decision of the district boundary

board may appeal from said decision to the circuit court * * *; provided, further, that an itemized budget showing contemplated expenditures shall be submitted to the county superintendent of schools; * * *''

Section 35-1008 requires the directors to prepare annually and deliver to the clerk ''an itemized statement of the amount of revenues which may be required for the purpose of carrying on the district schools for the ensuing year''. This same section of our laws also provides:

''It shall be the duty of the district clerk of any district before a meeting is held for the purpose of levying taxes to publish once a week for two successive weeks within thirty days immediately preceding such meeting in one or more newspapers published in the district and having a general circulation a budget statement of the estimated amount of revenue required for the ensuing year for the maintenance of the school district, and in districts in which no newspaper is published the clerk shall post such budget on the door of the schoolhouse in said district at least ten days within thirty days immediately preceding such meeting.''

We shall not pause to review the sections of our laws which grant administrative power to the directors. The general scope of their administrative powers is immaterial, if it follows from the above-quoted sections of our laws that it was necessary for the directors to insert in the annual budget the intended expenditure in behalf of the well and secure a favorable vote from the district's voters before incurring this indebtedness. Nor shall we pause to consider the returns which the district receives from the state, county and elementary school funds, because this source of income was altogether too small to discharge the claim now under consideration. In 1930 these three sources of income

yielded to district No. 41 less than $320. In 1931 they yielded $308. Section 35-925 requires that 85 per cent of the income received from these sources must be applied upon teachers' salaries. Likewise we deem it unnecessary to mention at length special powers conferred upon the board, like that of acquiring a schoolhouse site, which must be exercised in the special manner delineated in the paragraphs of the act conferring those special powers. See sections 35-1103 and 35-1105 and 1931 Session Laws, chapter 281.

 It will be observed, if we may recapitulate, that the above-mentioned sections of our law prescribe the manner in which the district must proceed in the levying of taxes. We remind ourselves that the power to tax is the power to impose upon the property owner a burden *in invitum* in character. All statutes making provision for the imposition of taxes are subject to strict construction. Cooley, Taxation, § 503. The rule of strict construction is especially applicable to statutes delegating to inferior bodies like school districts the power of taxation. Cooley, Taxation, § 83. Proceeding with our recapitulation, it will be observed that the first step taken by a school board in the imposition of a tax is the preparation of an itemized statement of the amount of revenue which the district will require during the ensuing year. Next, the board issues a call for an election, stating that one of the purposes of the voters' meeting will be the levying of a tax. This call must contain an itemized budget of all contemplated expenditures. Third, the clerk must post the budget upon the schoolhouse door if no newspaper is published in the district. Finally, upon the day of the voters' meeting, a majority ballot must be cast in favor of the budget. Thus, the budget becomes a proposition sub-

mitted to the voters for their approval or rejection. It is comparable to a general appropriation bill and its purpose is to provide the needed revenues until another election is called.

We quote from McQuillin, Municipal Corporations (2d Ed.) § 2348:

"In many cities and villages an appropriation ordinance, sometimes styled a budget, is required to be passed annually, and it is customary therein to set apart from the prospective revenues certain sums for various municipal purposes. And in some cities the passage of the budget by the council is deemed, of itself, an appropriation for the ensuing fiscal year of the sums set aside for the several purposes, departments and officers therein specified."

In *Weik v. Wausau*, 143 Wis. 645 (128 N. W. 429), the court held that after the city had raised $40,000 by taxation for the construction of a city hall the city officers could not legally use any part of that fund for any other purpose. A statute granted the city power to levy taxes "for the several purposes for which taxes are authorized to be levied and to apportion the same into such funds for city or ward purposes as they may provide". The court pointed out: "When this apportionment into funds is made, each fund is undoubtedly as fully 'appropriated by law' to its own special purpose as if the appropriation had been made by direct act of the legislature. Irrespective of the special statutory provisions above cited, this court has held that a fund raised by a city for a special purpose 'is a trust fund and equity will in a proper case interfere to prevent its diversion'." A distinction exists between the facts before us and those before the Wisconsin court. In our case the appropriation is made by the voters' favorable response to the proposition submitted to

them by the directors. Of necessity when the voters cast a favorable ballot the appropriation and apportionment is approved.

Nineteen hundred thirty-one Session Laws, chapter 380, provides:

"It shall be unlawful for any public official to expend any money in excess of the amounts, or for any other or different purpose than is provided by law. Any public official who shall expend any public money in excess of the amounts, or for any other or different purpose or purposes than is authorized by law, shall be civilly liable. \* \* \*"

Oregon Constitution, Art. IX, § 3, provides:

"No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same to which only it shall be applied."

 This statute and this constitutional provision promulgate a public policy rendering it unlawful for public officials to use any money exacted by tax laws for a specific purpose for any other purpose. The above-quoted excerpts from our school laws provide a means whereby funds are placed in the custody of the school board for the purposes mentioned in the school budget. When the voters make a favorable response with their ballots they appropriate money and apportion it to the several purposes mentioned in the school budget. The money having been raised for definite purposes, the school board cannot thereafter use it for any other purpose. It seems to us that this construction of our laws is inevitable. For if money raised for the salary of a clerk, the wages of the janitor, and fuel bills could be employed to discharge a debt incurred for drilling a well, the wholesome purposes of the budget provision of our laws would be overcome. It

would be useless for the legislature to give to those interested in the budget a right of an appeal to the district boundary board and to the circuit court if the school directors could employ funds appropriated for one purpose for any purpose they chose. These laws impose upon the directors an orderly, economical method governing their administration of the financial affairs of the school district, subject always to the general control of those who bear the burden exercised through the ballot. Before the board can gain authority to proceed with the project and expend the taxpayers' money in discharge of the resulting obligations, unless the item is of an emergency character, it must first submit the proposition to the approval of the voters. We exempt from this rule the items governed by special provisions, which we have already mentioned, like the acquisition of a schoolhouse and teachers' salaries. A favorable ballot is the grant of authority to proceed and the appropriation of the amount of money set opposite the item in the budget.

We believe that the above construction of our laws is not at variance with anything said in *Stoddard v. School Board District No. 91,* 140 Or. 203 (12 P. (2d) 309); *Hopkins v. Howard,* 131 Or. 448 (283 P. 18); or *Antin v. Union High School District No. 2,* 130 Or. 461 (280 P. 664, 66 A. L. R. 1271). In the first of the above cited cases, the claims which this court recognized as valid were based upon contracts which the school board had lawfully entered into. The claimants were school teachers. Section 35-1105, Oregon Code 1930, grants to the board express power to contract with teachers, and section 35-1106 prescribes their minimum wages. Thus, in that case, since the board had express power to hire the claimants, the issue now confronting

us was not present. In the second of the above cited cases, some district taxpayers sought an injunction to restrain the district from proceeding with the erection of a school playshed. The plaintiffs contended that the election notice was insufficient and that the structure was unnecessary. The answers took issue with both of these contentions and alleged an estoppel. An examination of the record discloses that when the work was inaugurated, involving an expenditure of $786.75, the district possessed more than $8,000 cash derived from the Oregon-California land grant fund. Our decision held that the structure was a necessary one, and that the plaintiffs, by knowingly permitting the work to proceed until it was half completed, had estopped themselves from maintaining their suit. The budget provisions of the school law were not mentioned in the pleadings, briefs nor decision. In the third of the above cases, the decision stated: "It is as much its (school district) duty to furnish water for the use of the school as it is to furnish heat or light for such purposes." This is the portion of the decision upon which the defendants rely. It is clear that the duty to which the decision referred was the duty which good citizenship imposed upon the voters of the district to provide all needed facilities.

■ It follows from the above that the board lacked authority to deepen the well and discharge the resulting claim, unless we can consider this as an emergency item. The evidence clearly shows that the board knew, since 1928, that the well needed attention. The minutes of the 1930 and 1931 board meetings record discussions concerning the condition of the well. Before this contract was awarded to Edwards and Billups, Wilford Duncan, the director who refrained from attending the

meeting at which the contract was signed, told one of his fellow directors that he doubted the board's authority to award the contract unless the district's voters met and approved the contemplated action. An emergency expenditure contemplates that an unforeseen contingency has developed which needs prompt attention. The slowly changing condition of the well which finally culminated in the awarding of this contract was not an emergency development.

■ The defendants Edwards and Billups, when they contemplated the acceptance of this contract, were charged with notice of every limitation which the above sections of our laws placed upon the authority of the school board. We quote from McQuillin, Municipal Corporation (2d Ed.) § 519:

"The principle is well established that a public or governmental corporation like a municipal corporation is not estopped by the acts of its officers when they exceed their powers. The rule is that persons dealing with such officers must, at their peril, ascertain the scope of their authority."

See also 56 C. J., Schools and School Districts, p. 484, § 513. Edwards and Billups accepted this contract when one of the directors and the clerk were absent. Another director had a financial interest in the undertaking. These circumstances should have warned the contractors of possible irregularities. It would not have been difficult for them to have ascertained the condition of the budget. The contemplated expenditure was not a trifle, but was a major item of expense to be incurred by a district having $850 of outstanding warrants and requiring an annual interest service charge of $67.70. We, therefore, conclude, in the application of the above rule to the circumstances before us, that

158

Edwards and Billups were charged with notice of the above limitation upon the authority of the directors.

■ The contention that the plaintiffs are estopped from maintaining this suit, in our opinion, is supported by neither the facts nor the law. Placing upon the testimony the construction most favorable to the defendants, it has been shown that only two of the plaintiffs knew that the work in progress consisted of a deepening of the well. One of the two, upon learning of the nature of the undertaking, at once offered strenuous objections. But since our laws have conferred upon the school board authority to proceed with the award of contracts in a prescribed manner only, and since this method was not followed, the contention that the plaintiffs are estopped finds no support in the rules of law applicable to this situation.

■ It follows from the above that the plaintiffs are entitled to an injunction restraining the school directors from using the district's money in paying Edwards' and Billups' charges until the voters provide a fund for that purpose. Nothing stated above will prevent the school district from making just compensation to the well drillers for their services whenever the proceedings outlined in the above-mentioned statutes are pursued.

The cause will be remanded to the circuit court with instructions to enter the appropriate decree. Costs and disbursements will be awarded to neither party.

CAMPBELL and BAILEY, JJ., concur.

BEAN, J., dissents.