Argued and submitted February 11; resubmitted In Banc September 9, reversed and remanded with instructions November 9, 1983, reconsideration denied January 13, petition for review allowed February 8, 1984 (296 Or 411)
See 299 Or 55 (1985)

# BURT,
*Appellant,*

*v.*

# BLUMENAUER et al,
*Respondents.*

## (A8112-07355; CA A25112)

672 P2d 51

Charles O. Porter, Eugene, argued the cause and filed the briefs for appellant.

John B. Leahy, County Counsel for Multnomah County, Portland, argued the cause for respondents. With him on the brief was Rudolph S. Westerband, Assistant County Counsel for Multnomah County, Portland.

WARDEN, J.

Newman, J., concurring.

**WARDEN, J.**

This is an action brought under ORS 294.100, which reads in pertinent part:

"(1)   It is unlawful for any public official to expend any money in excess of the amounts, or for any other or different purpose than provided by law.

"(2)   Any public official who expends any public money in excess of the amounts, or for any other or different purpose or purposes than authorized by law, shall be civilly liable for the return of the money by suit of the district attorney of the district where the offense is committed, or at the suit of any taxpayer of such district."

Also pertinent is ORS 260.432, which reads in part:

"(1)   *No person shall* attempt to, or actually, coerce, *command or require a public employe to* influence or *give* money, *service* or other thing of value to aid, promote or oppose any political committee or *to aid, promote or oppose* the nomination or election of a candidate, *the adoption of a measure* or the recall of a public office holder.

"(2)   *No public employe shall* solicit any money, influence, service or other thing of value or otherwise aid or promote any political committee or *aid, promote or oppose* the nomination or election of a candidate, *the adoption of a measure* or the recall of a public office holder *while on the job during working hours.* However, this section does not restrict the right of a public employe to express personal political views."[1] (Emphasis supplied.)

Defendants are the Multnomah County Dental Health Officer (Isman), the director of the Multnomah County Department of Human Resources (Lawrence), the Multnomah County Executive (Clark) and three of Multnomah County's five commissioners (Blumenauer, McCoy and Buchanan).

Plaintiff, a Multnomah County taxpayer, contends that defendants violated ORS 260.432, and thereby ORS 294.100, when they spent county funds (received as part of a federal grant) and directed county employees to spend county time in a "fluoridation public information project," preceding a vote on an anti-fluoridation measure on the City of Portland

---

[1] A violation may result in a civil penalty of $100. ORS 260.432(4). "Measure" is defined in ORS 260.005(8); opposition to or promotion of a ballot measure has been included in the statute since 1979. Or Laws 1979, ch 190, § 372.

ballot. Plaintiff sought to require defendants to repay $7,040.10 to Multnomah County and $13,974.62 to the Center for Disease Control of United States Department of Health, Education and Welfare. Both plaintiff and defendants moved for summary judgment; the trial court entered judgment in favor of defendants, finding as a matter of law that the flouridation information project was not political activity, and plaintiff appeals. We reverse and remand.

On August 28, 1979, the City of Portland announced that the anti-fluoridation measure[2] had qualified, via initiative petition, to appear on the May 20, 1980, primary election ballot. The ballot measure was to be entitled, "Eliminates Mandatory Fluoridation of City Water." On February 21, 1980, defendant Isman applied for a federal grant from the Public Health Service unit of the United States Department of Health, Education and Welfare.[3] Defendant Clark was specified as the "certifying representative" on the grant application form. The grant application requested $55,573 of federal funds, to be matched by $38,573 from the county, to establish a "Fluoridation Public Information Project." The county's contribution was to be in the form of time and service of 17 county employes, including Isman,[4] under the ultimate supervision of defendant Lawrence.

Although the Multnomah County Department of Human Services had conducted educational efforts about the benefits of fluoridation in the past, the application for a federal grant was not made until after the anti-fluoridation measure was placed on the ballot.[5] A document, which

[2] In 1978, the voters of the City of Portland approved a city charter amendment allowing fluoridation of the city's water supply. The 1980 anti-fluoridation measure, which passed, repealed the city charter amendment.

[3] See 42 USC § 247(b)(1976). Agency guidelines for fluoridation project grants state that the primary goal of the grants is "to achieve near-universal community fluoridation." Specific objectives listed were, among others, to "promote fluoridation at national, regional, and state levels" and to "carry on national informational and educational activities through mass media and other outlets."

[4] According to the grant application, employes were to spend specified percentages of working hours, ranging from 5 to 100 percent, over a three month period, on the project.

[5] A Notice of Intent to apply for the grant, which was subsequently withdrawn because of a perceived lack of support from the county commissioners, was originally submitted by Isman on July 27, 1979. That was before the anti-fluoridation measure qualified for the ballot but at a time when the political committee supporting the initiative had already submitted 21,000 signatures, 6,000 more than necessary to qualify, to the City Auditor.

plaintiff's affidavit asserts is a rough draft of the grant application, states:

> "A. Goal: Portland residents will vote to retain fluoridation of the Portland Bull Run Watershed in the 1980 primary election."

This language did not find its way into the final document, which stated instead:

> "B. *Objectives*
>
> "1. Public education efforts pertaining to fluoridation, conducted by the Multnomah County Department of Human Services, will double by September 30, 1980."

At a March 6, 1980, meeting of the Board of County Commssioners, Lawrence endorsed the project and, after a debate over the propriety of the project, the grant application was approved by a 3-2 vote, defendants Blumenauer, Buchanan and McCoy comprising the majority.

The federal grant was awarded on April 7, 1980, for a budget period from April 1, 1980, to June 30, 1980.[6] The major use of the federal grant funds was for contracts with advertising and research firms. A research firm conducted surveys of public attitudes and knowledge about fluoridation. An advertising firm conducted a mass media campaign, which included placing full-page ads in Portland's major daily newspaper.[7] The activities of the county employes, who were under the supervision and direction of defendants Lawrence and Isman, included public presentations, distribution of written materials and posters, training speakers, writing articles and press releases and operation of a telephone "hot line." Federal funds continued to be expended after the election for surveys of public opinion and knowledge, but $18,000 of the federal grant money was never spent.

■■ Defendant Isman sought legal advice as to what activities were permitted by law and arrived at the conclusion that "anything short of outright advocacy" was permitted.

---

[6] The budget period was subsequently extended to September 30, 1981.

[7] One full-page ad, in the May 8, 1980, edition of *The Oregonian*, stated in large black print, "People who don't use fluoridated water have something to show for it" and depicted a mouth with missing teeth. Small print at the bottom of the page stated "Learn the facts" and gave the number of the county's "Fluoridation Hotline." Other ads appeared on May 11, 15, 18 and 19, 1980.

Although project participants were directed by Isman and Lawrence not to advocate or solicit any particular vote on the ballot measure,[8] defendants concede that the project communications "were one-sided and that they were purposely so." They argue that the project was one-sided only because it was the scientifically arrived at medical opinion of Isman and Lawrence that fluoridation has no disadvantages, only advantages. Isman and Lawrence were well aware of the restraints placed on political activity by statute but considered that it was their duty as doctors and public health officials to publicize the benefits of fluoridation. In his affidavit supporting his motion for summary judgment, plaintiff states that, at the meeting of the Board of Commissioners at which the grant application was considered, defendant Lawrence testified:

> "For me to fail to act publicly in support of community fluoridation would constitute dereliction of duty * * * the message will be one sided because fluoridating the water of Portland is, in my view, in the best interests of the health of our people. There is no other position I can or will support. There is potential conflict in this position, nonetheless. The public health issue, water fluoridation, has been politicized and our state law attempts to control political activity by public employees. It is my commitment to you in this matter that my official efforts and those of our Department will be limited to provision of information about the benefits of community water fluoridation. * * * I have no responsibility to represent the other side in this issue and will not."

Good faith, however, is not a defense in an action under ORS 294.100. *Porter v. Tiffany,* 11 Or App 542, 549-50, 502 P2d 1385 (1972), *rev den* (1973). Likewise, strength of conviction in the minds of agency officials of the correctness of the position they espouse provides no immunity for violation of ORS 260.432.

Defendants also argue that their actions were not only justified but are mandated by the statutes which create a county department of health. *See* ORS ch 431. In particular, they cite ORS 431.416, which reads:

> "The district or county department of health *shall;*
>
> "* * * * *

_____

[8] At one point, evidently, someone within the department failed to abide by the direction, because a flyer distributed by "Oregonians for Fluoridation" that urged readers to "vote no on 51" included "Multnomah County Department of Human Resources" in a list of endorsers.

"(2)   Conduct activities necessary for the preservation of health or prevention of disease in the area under its jurisdiction." (Emphasis supplied.)

They appear to argue that this statute authorizes any activity which in the judgment of county health officials serves to carry out this broad mandate, despite the fact that that same activity serves to "aid, promote or oppose * * * the adoption of a measure," which is forbidden by ORS 260.432. We do not find that argument persuasive.

ORS chapter 431 defines the duties of a county health department in the most general ways, but ORS 260.432 is specific about the actions it makes unlawful. A specific provision controls over a general one. ORS 174.020. In order to give effect to both statutes, we hold that ORS 431.416 authorizes activities necessary for public health *except when* those activities violate ORS 260.432. Funds expended in activities which are generally authorized, but specifically forbidden, are for a "different purpose than provided by law" under ORS 294.100(1). For example, the Sheep Commission has statutory authority to "represent and protect the interests of the sheep and wool industry with respect to any legislation or proposed legislation or executive action which may affect that industry." ORS 577.730(3). That statute contains a clearer grant of authority for the agency to engage in political activity than does ORS 431.416. We have held that ORS 577.730(3) does not empower the Sheep Commission to donate money to a group opposing an initative measure to ban leg-hold traps, "even though those purposes may coincide with the Commission's statutory function." *Oregonians Against Trapping v. Dept. of Agric.,* 56 Or App 78, 82, 641 P2d 72 (1982); *see also Porter v. Tiffany, supra.*

Finally, defendants claim that, although they did not present a neutral picture of the merits and demerits of fluoridation, as a matter of law the fluoridation project did not violate ORS 260.432, because it was only part of a long history of departmental activities promoting fluoridation as a public health measure.[9] From plaintiff's affidavit it appears that

---

[9] Defendant Lawrence's affidavit states:

"It was my medical opinion as a Health Officer for Multnomah County and it remains my medical opinion that fluoridation of water systems is a safe, economical and the most efficient mechanism for maintaining the good dental

defendant Isman asserted in his deposition that it was "coincidental" that the Fluoridation Public Information Program was "quite active" in the period prior to the May, 1980, election.

In deciding whether similar activities violate the law, some courts have drawn a distinction between neutral education and advocacy, although the difference may seem to be one merely of perspective. The leading such case is *Citizens to Protect Pub. Funds v. Board of Education,* 13 NJ 172, 98 A2d 673 (1953). In that case the court said in dictum that a school board had authority to spend public funds to educate the public about the consequences of the outcome of an upcoming bond issue vote but that, by over-dramatizing the dire consequences of a "no" vote and by exhorting voters to "vote yes," the board had strayed into advocacy and "thus imperilled the propriety of the entire expenditure." 98 A2d at 677. In *Stanson v. Mott,* 17 Ca3d 206, 130 Ca Rptr 697, 551 P2d 1 (1976), the court held that "determination of the propriety or impropriety of the expenditure depends upon the careful consideration of such factors as the style, tenor and timing of the publication * * *." 551 P2d at 12. *See also,* Prusia, *The Expenditure of Public Funds in Election Campaign Advocacy: Liability of Local Public Officials,* 52 Or L Rev 155, 157 n 9 (1973); 35 Op Att'y Gen 169 (1970).

■ Once a measure has qualified for placement on a ballot, ORS 260.432 effectively prohibits public employes from promoting or opposing its adoption during working hours. Although officials and employes of the agency might possess valuable expertise and information, when an issue that an agency views as strictly a matter of medical science has become a ballot measure, the agency may not participate in the debate using public time or funds, even if what the agency sees itself as doing is merely providing the public with scientifically verified information or merely continuing an ongoing activity of the agency.

---

health of children and for preserving the dental health of adults. For at least ten years prior to the May 20, 1980 ballot measure, and consistently to the date of this affidavit, Multnomah County Health officers have consistently advocated the implementation and maintenance of fluoridated water systems within Multnomah County. In my opinion, the county's long-standing publicized position is based upon the most accurate and scientifically current information available."

■    It cannot be said as a matter of law that defendants did not expend public money for a different purpose than authorized by law. There are genuine issues of material fact. Among those issues are whether defendants, or some of them, required public employes to oppose, or expended public money to oppose, the adoption of the anti-flouridation ballot measure. It was therefore error to grant defendants a summary judgment.

Reversed and remanded for further proceedings not inconsistent with this opinion.

**NEWMAN, J.,** concurring.

I concur that defendants are not entitled to summary judgment because there are genuine issues of material fact to be tried. A few additional comments appear advisable. The majority correctly states that some courts have drawn a distinction between neutral education and advocacy. It is an important distinction. Public bodies must provide information to voters regarding ballot measures affecting their programs, whoever proposes the ballot measure, both to inform the electorate and to negate a charge of secret, unresponsive government.

It has long been recognized, although the statutes here involved are not new, that a school district, for example, may use public funds to inform district voters of facts pertinent to a school tax levy election. *See* 35 Op Att'y Gen 169 (Or 1970). The information that public bodies provide, however, must be fairly presented, and public funds cannot be used to advocate that a citizen vote in a particular way at the election or otherwise to "aid, promote or oppose" a ballot measure. *See* ORS 260.432; *Porter v. Tiffany,* 11 Or App 542, 502 P2d 1385 (1972).

A school district, for example, can have little hope for public support if it refuses to provide information about a proposed tax levy. Judge (now Justice) Brennan commented on this matter in *Citizens to Protect Public Funds v. Board of Education,* 13 NJ 172, 98 A2d 673 (1953).

"There is no express statutory provision authorizing the expenditure by boards of education of public funds in the manner done by the defendant board for the printing and distribution of the booklet. The power, however, within the

limits hereafter stated, is to be found by necessary or fair implication in the powers expressly conferred * * *.

"The power so implicit plainly embraces the making of reasonable expenditures for the purpose of giving voters relevant facts to aid them in reaching an informed judgment when voting upon the proposal. In these days of high costs, projects of this type invariably run into very substantial outlays. This has tended to sharpen the interest of every taxpayer and family man in such projects. Adequate and proper school facilities are an imperative necessity, but the large additional tax burden their cost often entails concerns taxpayers that they be obtained with the maximum economy of cost. At the same time the complexities of to-day's problems make more difficult the task of every citizen in reaching an intelligent judgment upon the accommodation of endurable financial cost with the acknowledged need for adequate education. The need for full disclosure of all relevant facts is obvious, and the board of education is well qualified to supply the facts. But a fair presentation of the facts will necessarily include all consequences, good and bad, of the proposal, not only the anticipated improvement in education opportunities, but also the increased tax rate and such other less desirable consequences as may be foreseen. If the presentation is fair in that sense, the power to make reasonable expenditure for the purpose may fairly be implied as within the purview of the power, indeed duty, of the board of education to formulate the construction program in the first instance. And the choice of the media of communication to give such facts, whether by the use of a booklet, as in this case, radio broadcast, newspaper advertising, or other means, is within the discretion, reasonably exercised, of the board of education. * * *" 98 A2d at 677

Among the facts which should be determined at trial are whether the material that the county distributed was "promotional" or "informational." The content and use of the material prepared and distributed with the expenditure of public funds or public employe time must be examined. The distinction to which the majority refers may be decisive.