Argued and submitted May 1, 1984, affirmed and remanded April 23, 1985

# BURT,
*Respondent on Review,*

*v.*

# BLUMENAUER et al,
*Petitioners on Review.*

(TC A8112-07355; CA A25112; SC S30238)

699 P2d 168

John B. Leahy, County Counsel for Multnomah County, Portland, argued the cause for petitioners on review. With him on the briefs was Rudolph S. Westerband, Assistant County Counsel, Portland.

Charles O. Porter, Eugene, argued the cause and filed the briefs for respondent on review.

Timothy J. Sercombe and Harrang, Swanson, Long & Watkinson, P. C., Eugene, filed a brief *amicus curiae* for City of Eugene.

Alan S. Bachman, Chief Assistant County Counsel, Hillsboro, Paul Snider, Legal Counsel, Association of Oregon Counties, Salem, and Michael E. Judd, Assistant County

Counsel, Oregon City, filed a brief *amicus curiae* for Association of Oregon Counties.

ROBERTS, J.

## ROBERTS, J.

The issue is whether defendant public officials can be held personally liable for the return of public monies expended to promote water fluoridation during an election period when that issue was before the voters.

## I.   STATEMENT OF THE CASE

Plaintiff taxpayer sued three Multnomah County Commissioners, the county executive and two county health officers for unlawful expenditure of federal and matching county grant monies. The funds were used to pay salaries for persons, including one of the health officers, who staffed a "fluoridation public information project" and to hire advertising firms to publicize the project. The project promoted the benefits of fluoridation. Toward this end an advertising firm conducted public opinion surveys and a mass media campaign, which included newspaper advertisements. The county employes engaged in public presentations, distribution of posters and pamphlets, writing articles and press releases and operation of a telephone hotline.

ORS 294.100 provides in relevant part:

"(1)   It is unlawful for any public official to expend any money in excess of the amounts, or for any other or different purpose than provided by law.

"(2)   Any public official who expends any public money in excess of the amounts, or for any other or different purpose or purposes than authorized by law, shall be civilly liable for the return of the money by suit of the district attorney of the district where the offense is committed, or at the suit of any taxpayer of such district."

Plaintiff is a taxpayer in Multnomah County who is entitled to bring suit under this statute. Plaintiff contends that defendants expended money for a purpose different than authorized by law when they spent money in the fluoridation project at a time when an anti-fluoridation measure was on the City of Portland ballot. At the time relevant to this case, ORS 260.432 prohibited "any person" from, among other things, requiring a "public employe to * * * aid, promote or oppose * * * the adoption of a measure * * *." The statute also prohibits public employes from engaging in the same conduct

voluntarily while on the job during working hours.[1] Plaintiff asserts that county officials violated this statute by assigning public employes to work on the fluoridation project, with the result, according to plaintiff, that public employes were required to oppose the anti-fluoridation measure in violation of ORS 260.432. Plaintiff asserts that ORS 260.432 is a legislative declaration that public funds cannot be used to promote one side of an issue before the voters. He concludes that expenditure of funds in this way was for a "different purpose * * * than authorized by law" in violation of ORS 294.100.

Defendants respond that funding of the fluoridation project was authorized by ORS 431.416(2) which, at the time relevant to this case, directed district and county departments of health to "[c]onduct activities necessary for the preservation of health and prevention of disease in the area under [their] jurisdiction."[2]

---

[1] At the time pertinent to this case, ORS 260.432 provided in relevant part:

"(1) No person shall attempt to, or actually, coerce, command or require a public employe to influence or give money, service or other thing of value to aid, promote or oppose any political committee or to aid, promote or oppose the nomination or election of a candidate, the adoption of a measure or the recall of a public office holder."

"(2) No public employe shall solicit any money, influence, service or other thing of value or otherwise aid or promote any political committee or aid, promote or oppose the nomination or election of a candidate, the adoption of a measure or the recall of a public office holder while on the job during working hours. However, this section does not restrict the right of a public employe to express personal political views."

"(* * * * *)"

In 1983, this statute was amended to omit the work "aid." Or Laws 1983, ch 392, § 1.

[2] At the time material to this case, ORS 431.416 provided in relevant part:

"The district or county department of health shall:

"(1) Administer and enforce the rules of the county or district board of health and public health laws and the rules of the Health Division which each local public health administrator or the county or district board of health is charged with carrying out, or which the board or the county commission has by agreement with the Health Division contracted or has been delegated to carry out.

"(2) Conduct activities necessary for the preservation of health or prevention of disease in the area under its jurisdiction."

In 1983, the statute was amended to enumerate a non-inclusive list of activities which local health officials are authorized to carry out. Included among these activities is the distribution of health information. Or Laws 1983, ch 398, § 4.

Both sides moved for summary judgment. The trial court ruled in favor of defendants. The Court of Appeals reversed, reasoning that if defendants violated ORS 260.432, they expended funds for an unauthorized purpose and could face personal liability under ORS 294.100 for the return of funds paid out. The Court of Appeals held that a specific provision, the election finance law, controls over a general statute authorizing public health activities, ORS 431.416. The court remanded for a factual determination whether defendants' activities were "promotional" or "informational." If the former, the court reasoned that the activities would conflict with the election finance law. 65 Or App 399, 672 P2d 51 (1983).

## II. ILLUSTRATIVE HOLDINGS

Other state courts have considered variations on the question whether government may speak out or whether it must refrain from speaking. In tracing the development of the government speech cases, one finds the analyses shifting from demands for explicit authority for a particular government activity to concerns with an authorized action's conflict with other laws, both statutory and constitutional. In the earlier cases in this area, courts placed limitations on municipal spending power by narrowly defining "corporate purpose" and "municipal function," and uniformly prohibited expenditures for government speech.

This early view of municipal authority, also known as Dillon's rule,[3] appears in *Elsenau v. City of Chicago,* 334 Ill 78, 165 NE 129 (1929), a taxpayer suit to enjoin expenditures by the city for advertisements in support of a proposed bond measure. The court recited the popular maxims of the day, that municipal corporations possess no inherent power, and that statutes granting powers to municipal corporations are

---

[3] The rule derives from 1 Dillon, Municipal Corporations, § 237, at 448-50 (5th ed 1911) which asserted:

"It is a general and undisputed proposition of law that a *municipal corporation possesses and can exercise the following powers, and no others:* First, those granted in *express words;* second, those *necessarily or fairly implied* in or *incident* to the powers expressly granted; third, those *essential* to the accomplishment of the declared objects and purposes of the corporation, — not simply convenient, but indispensable. Any fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied." (Footnote omitted, emphasis in original.)

strictly construed, and ruled that "[t]he conduct of a campaign, before an election, for the purpose of exerting an influence upon the voters is not the exercise of an authorized municipal function and hence is not a corporate purpose of the municipality." 334 Ill at 81-82.

In *State ex rel Port of Seattle v. Sup'r Ct,* 93 Wash 267, 160 P 755 (1916), the court enjoined port commissioners from spending public money to campaign in opposition to a referendum increasing their number and placing a debt limit on the port. The court found no authority for such an expenditure. It stated that municipal corporations possess "only those powers expressly granted or such as are necessarily implied." 93 Wash at 269. Though the court did not articulate the constitutional issues underlying such government speech activities, it noted the similarities between the instant case and the possibility that "[t]he commissioners might determine that the best interests of the business of the port required that the individual members of the commission be perpetuated in office, and, because of that reason, use the funds of the port to insure their own election," 93 Wash at 273. *Shannon v. City of Huron,* 9 SD 356, 69 NW 598 (1896), presents a similar analysis.

In *Mines v. Del Valle,* 201 Cal 273, 257 P 530 (1927), the court found the Board of Public Service Commissioners liable for funds expended for "printing cards, banners, automobile windshield stickers, automobile banners, labels, circulars, hand bills, dodgers, and postal cards; for distributing and circulating the same; for constructing a float; and for advertising in certain newspapers" in support of a bond measure. 201 Cal at 276. The court found that the commissioners' claimed authority to promote a utility bond was neither "given to them by any express provisions of the charter, nor can it be implied from any of the terms thereof." 201 Cal at 288.

In *Citizens to Protect Public Funds v. Board of Education,* 13 NJ 172, 98 A2d 673 (1953), the New Jersey Supreme Court found implied power for the school board to expend funds to publish an informational booklet about a bond proposal requiring voter approval. The court interpreted the school board's authority more broadly than older cases had done. Nonetheless, the expenditure was held unlawful because

the school board had presented only one side of the issue, thereby shutting out those with dissenting views. In the court's words:

"* * * the board made use of public funds to advocate one side only of the controversial question without affording the dissenters the opportunity by means of that financed medium to present their side, and thus imperilled the propriety of the entire expenditure. The public funds entrusted to the board belong equally to the proponents and opponents of the proposition, and the use of the funds to finance not the presentation of facts merely but also arguments to persuade the voters that only one side has merit, gives the dissenters just cause for complaint." 13 NJ at 180-81.

The power of local governments has expanded in recent times. Our own statutes illustrate the trend. Under the General Laws 1862, section 870 county courts and boards of county commissioners were given "authority and powers * * * to transact county business," by means of a specific enumeration of the types of business they were authorized to transact. They were authorized, for example, to erect and repair county public buildings such as jails and courthouses, to repair, establish and vacate county roads and bridges, and to grant and revoke licenses for dance halls and groceries. The specificity with which these authorities are listed by statute indicates the degree to which the legislature perceived local government authority to be circumscribed. In 1958, the Oregon Constitution was amended to permit county home rule. Or Const, Art VI, § 10. In 1973, ORS 203.035 was added to authorize all counties to "exercise authority within the county over matters of county concern, to the fullest extent allowed by the Constitution and laws of the United States and of this state, as fully as if each particular power comprised in that general authority were specifically listed * * *." ORS 203.035(1).

In recent times, the judicial demand for explicit expressions of authority and a recognition of only attendant authorities "necessarily implied" by those expressed has given way to an interpretation that local governments have broad powers subject only to constitutional or preemptive statutory prohibitions. Thus, it is more often possible to find some source of authority for a government speech-related expenditure. As the first inquiry — whether a particular expenditure

is authorized — is more often answered in the affirmative, courts have proceeded to consider whether the government action, even though authorized, conflicted with some other law or constitutional provision.

Some recent state cases deserve attention, as much as for what they fail to say as for what they say. The courts struggle, often unsuccessfully, to identify the legal premises for what *Stanson v. Mott,* 17 Cal 3d 206, 217, 130 Cal Rptr 697, 551 P2d 1 (1976), described as a "uniform judicial reluctance to sanction the use of public funds for election campaigns."

In *Stern v. Kramarsky,* 84 Misc 2d 447, 375 NYS2d 235 (NY Sup Ct 1975), taxpayers sought to enjoin the Division of Human Rights from supporting the passage of a state equal rights amendment. The court held that despite broad statutory authority to promote and protect human rights, the agency was prohibited from "advocat[ing] their favored position on any issue * * *. So long as they are an arm of the state government they must maintain a position of neutrality and; impartiality." 375 NYS2d at 239. The court reasoned: "The spectacle of state agencies campaigning for or against propositions or proposed constitutional amendments to be voted on by the public, * * *, can only demean the democratic process." *Id.* The court alluded to restraints on the "democratic process," *id.,* to the "proper function of a state agency" 375 NYS2d at 237, and to the need to construe the agency's authority "in the context of the State and Federal constitutions." *Id.* The agency was not enjoined from informing and educating the public concerning the proposed amendment, but it could not advocate a positive or negative vote on the amendment. 375 NYS2d at 240.

California has had a series of cases since *Mines v. Del Valle, supra,* addressing the issue of goverment speech. In *Stanson v. Mott, supra,* the court explained why, in its view, other courts had not permitted expenditures of public funds for campaign purposes:

> "Underlying this uniform judicial reluctance to sanction the use of public funds for election campaigns rests an implicit recognition that such expenditures raise potentially serious constitutional questions. A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair

advantage on one of several competing factions. A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office * * *; the selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process." 17 Cal 3d at 217.

The court alluded as well to the need to protect the rights of dissenting taxpayers when public funds are spent to advocate an opposing position. However, the court found no need to resolve "the serious constitutional question that would be posed by an explicit legislative authorization of the use of public funds for partisan campaigning * * *." 17 Cal 3d at 219. The court resolved the question on authority grounds, requiring statutory authorization in "clear and unmistakable language * * *," 17 Cal 3d at 219-20, quoting *Mines v. Del Valle, supra,* 201 Cal at 287.

In *Stanson v. Mott,* the court attempted to distinguish between improper campaign expenditures and proper informational activities. The court concluded that the propriety of an expenditure "depends upon a careful consideration of such factors as the style, tenor and timing of the publication; no hard and fast rule governs every case." 17 Cal 3d at 222 (Footnote omitted). The court remanded the case for a factual determination whether the public funds were used for informational or advocacy activities.

Following *Stanson v. Mott,* two related cases arose challenging expenditures of public funds by the California Commission on the Status of Women. The funds were used to promote ratification of the proposed federal equal rights amendment. In the first case, *Miller v. Miller,* 87 Cal App 3d 762, 151 Cal Rptr 197 (1978), the commission acknowledged that it actively promoted ratification of the equal rights amendment nationally and in the state of California. The court relied on *Stanson v. Mott* for the following analysis: First, was the commission's activity legislative lobbying and permissible, or was it election campaigning?[4] If the latter, was

---

[4] The court found that lobbying by public agencies was authorized by statute. The court further relied on the distinction as to the audience to which the persuasive efforts were directed. 87 Cal App 3d at 768-69.

it "clearly and unmistakenly" authorized by statute? A third issue, which the court acknowledged but did not reach, raised the constitutionality of the expenditure regardless of legislative authorization. The court reversed summary judgment for the defendants and remanded the case for a factual determination whether the activities of the commission were "informational" or "promotional." The court found that only informational activities were authorized by statute.

The follow-up case of *Miller v. California Com'n on Status of Women,* 151 Cal App 3d 693, 198 Cal Rptr 877 (1984), arose after the legislature amended the commission's enabling statute expressly to authorize the commission to state its viewpoint on the issues it was responsible to examine. The court interpreted this amended statute as a "legislative warrant to advocate and promote the commission's positions on these subjects." 15 Cal App 3d at 698.

Plaintiffs were left with a constitutional attack which they framed in terms of impermissible compelled support (taxpayer dollars) for government advocacy with which plaintiffs disagreed. The court rejected the argument that government must be neutral on controversial topics and upheld the commission's advocacy. The court stated: "That the imprimatur of government has conferred an advantage upon the commissioners is undeniable. That advantage, however, had not risen to the level of drowning out plaintiffs." 151 Cal App 3d at 702. It was also important to the decision that there was no claim that the statute would authorize advocacy of a position during an election campaign.

Of greatest similarity to the instant case is the Massachusetts case of *Anderson v. Boston,* 376 Mass 178, 380 NE2d 628 (1978), *appeal dismissed* 439 US 1060, 99 S Ct 822, 59 L Ed 2d 26 (1979). Some background on events leading up to the case is helpful.

In 1907 Massachusetts enacted a statute that prohibited private corporate expenditures in connection with elections and referendums. Amendments over the years allowed some expenditures, but only if the issue before the voters was one "materially affecting * * * [the] business * * * of the corporation." Mass Ann Laws ch 55, § 8 (Michie/Law Co-op 1978). The interpretation of this statutory phrase was a subject of continuing dispute between the judiciary and the legislature, with the judiciary permitting corporate campaign

expenditures. *See* Note, *Municipal Free Speech: Banned in Boston?*, 47 Fordham L Rev 1111, 1112-13, 1125-26 (1979).

In 1975 the legislature amended the corporate expenditure statute to prohibit corporate election contributions "solely concerning the taxation of the income * * * of individuals * * *." The corporations succeeded in having the statute declared unconstitutional on federal First Amendment grounds in *First National Bank v. Bellotti*, 435 US 765, 98 S Ct 1407, 55 L Ed 2d 707 (1978). The corporations then embarked on a publicity campaign to defeat the next taxation referendum proposal which appeared on the ballot in 1978. In response, the City of Boston, exercising its home rule authority, passed an ordinance authorizing the city to expend funds for such activities as staffing with city employes an Office of Public Information on Classification for the purpose of collecting and disseminating information about the tax proposal, organizing citizen volunteers and providing city offices and telephones at no cost, and contributing financially to a campaign organized by the Massachusetts Mayors' Association.

Taxpayers obtained an injunction against these expenditures. The Massachusetts Supreme Court declined to read municipal authority to appropriate funds narrowly as older cases might have done. Rather, the issue as the court saw it was whether "the city's purported home rule ordinance is inconsistent with any law enacted by the Legislature under the powers reserved to it under the Home Rule Amendment." 376 Mass at 184-85. Massachusetts election laws restricted corporate expenditures in elections and forbade any municipal employe, among others, from soliciting or receiving any payment of money for any political purpose whatever. The court regarded these prohibitions as demonstrating "a general legislative intent to keep political fund raising and disbursing out of the hands of nonelective public employees and out of city and town halls." 376 Mass at 186-87 (footnote omitted). The court held that the state statute regulating election financing preempted any right a municipality might otherwise have to appropriate funds for the purpose of influencing the result on a referendum question.

## III.  THEORETICAL BACKGROUND

Although the cases come to uniform results, that is, they consistently disallow government advocacy in support of one side of issues before the voters, the legal premises upon which they stand are inconclusive. This lack of precision has led commentators to examine the larger issues underlying the problem of "government speech." *See* Shiffrin, *Government Speech,* 27 UCLA L Rev 565 (1980). The literature attempts to explain the often expressed but infrequently probed "uniform judicial reluctance" to uphold government advocacy. The commentators draw attention to the larger universe of government advocacy as it implicates constitutional principles. Although we find it unnecessary to decide this case on constitutional grounds, it is helpful to understand the concerns that stretch out to many forms of so called government speech, and the developing and as yet undefined constitutional boundaries within which laws concerning government publicity must operate.

In a democracy, efforts by government to publicize and promote its policy views pose an obvious problem. On the one hand, democratic accountability requires that public officials explain their past, present and intended actions. This means explaining policy goals and reasons for choosing or rejecting particular ways of pursuing those goals. On the other hand, the legitimacy of the chosen policy rests on the consent, if not consensus, of the governed; excessive or questionable efforts by government to manufacture the consent of the governed calls the legitimacy of its action into question.

The concerns with government publicity for its chosen policies extend to government managed and commonly accepted functions such as public education, public libraries, museums, theatres, and public broadcasting, all of which involves inescapable cultural choices and incidentally or designedly shape society's view of itself and its values. Yudof, When Government Speaks (1983). Scholars have sought restraints on such government intervention in the First Amendment of the federal constitution. *See, e.g.,* Kamenshine, *The First Amendment's Implied Political Establishment Clause,* 67 Calif L Rev 1104 (1979); Yudof, *When Governments Speak: Toward a Theory of Government Expression and the First Amendment,* 57 Tex L Rev 863 (1979).

■     It hardly seems necessary to rely on the First Amendment, at least when government resources are devoted to promoting one side in an election on which the legitimacy of the government itself rests. The principles of representative government enshrined in our constitutions would limit government intervention on behalf of its own candidates or against their opponents even if the First Amendment and its state equivalents had never been adopted. Federal limits against abuse even in the states already were implied in the guarantee of a "Republican Form of Government," U.S. Const art. IV, § 4. Related assumptions about representative government may be found in Oregon Constitution, Article II, section 1: "All elections shall be free and equal," and in Article I, section 26, respecting the right of the "inhabitants of the State" to "consult for the common good," and to "[instruct] their representatives."

■     Commentators examining the potential constitutional issues which arise when government promotes its own views come to a few uniform conclusions: Neither the free speech clauses, nor principles of representational democracy require that governments, as such, refrain from speech entirely. However, assuming governments may engage in some forms of speech, they are still prohibited from advocacy intended to perpetuate themselves in power. Drawing lines between these two extremes is the task required in this case.

A view of where the line lies for appropriate government speech will be tempered by a perception both of the purpose of constitutional free speech guarantees and the function of government. If the free speech guarantees are viewed as intending to ensure a "marketplace of ideas"[5] as a means toward intelligent self-government one could conclude that government may facilitate the market but not itself enter the bidding. If one purpose of government in our society is not only to moderate among competing private interests and voices but also to promote its view of the pubic interest, or, in Shiffrin's words, "the good life," Shiffrin, *supra*, at 566, the permissible limits of government speech must be expanded

---

[5] Justice Holmes wrote of the competitive market of ideas in *Abrams v. United States*, 250 US 616, 630, 40 S Ct 17, 63 L Ed 1173 (1919) (Holmes, J., dissenting).

accordingly. On the other hand, if one perceives government's purpose to be an arbiter of competing private interests, a synthesizer or umpire, the need for the propriety of a government voice in the "marketplace" diminishes. Under either view, however, government propaganda for its chosen policies can be criticized for denying equal chances to proponents of competing policies, a concern expressed in *Citizens to Protect Public Funds v. Board of Education, supra,* and *Stanson v. Mott, supra,* or for "drowning out" the free speech of opposing voices, a problem acknowledged in *Miller v. California Com'n on Status of Women, supra.*

■ Suggested analyses of the limits of government speech range from an interpretation of the First Amendment as containing an implied prohibition against political establishment, similar to the express prohibition against establishment of a religion by the government,[6] Kamenshine, *supra,* to the position that government can "add its own voice to many it must tolerate, provided it does not drown out private communication." Tribe, *American Constitutional Law* § 12-4, at 590 (1978). Certainly, at a minimum, governments must refrain from supporting a particular candidate for office. "It is not the function of the government to get itself reelected." Emerson, The System of Freedom of Expression 699 (1970); *see also State ex rel Port of Seattle v. Sup'r Ct, supra.*

When considering government speech, it becomes necessary to recognize the difference between advocacy by "governments" as institutions, an activity which may call into question the constitutional principles explained here, and advocacy by individual policy makers who not only enjoy constitutional protection to speak but whose position requires them to develop, implement and garner support for their policy choices. There is no easy way to define what is electoral or political advocacy by an individual policy maker and when the advocacy is an official action of "government." Nonetheless, the distinction is significant. One would not expect to muzzle the official who is personally responsible for a program or policy, yet in local government, that official alone may be the relevant "government"; no bureaucratic staff may be involved.

---

[6] The federal First Amendment provides in relevant part: "Congress shall make no law respecting an establishment of religion * * *."

Equally difficult are attempts to distinguish partisan from non-partisan speech or information from advocacy. *See Stanson v. Mott, supra.* This is because "[n]on-partisan aspects such as informing the populace of government policy and explaining that policy are also necessarily partisan because incumbent candidates almost invariably claim that their reelection is justified by their link to the government policy they explain and defend." Shiffrin, *supra,* at 603.

A government's controversial advocacy may aim at winning support or opposition, not for any action of its own electorate, but for action by another government; for instance, local officials may spend public resources to persuade Congress, the state legislature or another level of government of a policy which many of the officials' own constituents oppose. This "lobbying" of the government's own legislature or of policymakers at another level of government differs from government propaganda directed to its own constituency in at least one respect. No matter how aggressive and effective such "lobbying" may be as a matter of political reality, in principle those to whom it is addressed are themselves public officials with an independent responsibility to decide on the public interest as they perceive it. Moreover, if they have legislative power over the importuning officials, they may restrict their use of resources for lobbying or other publicity; besides, they need not make themselves available to the uninvited advocate. Other courts have examined the difference between lobbying and soliciting votes from the electorate. *Stanson v. Mott, supra,* 17 Cal 3d at 218; *Anderson v. Boston, supra,* 376 Mass at 188 n 11; *Miller v. Miller, supra,* 87 Cal App 3d at 768-69.[7]

---

[7] *Miller v. Miller,* 87 Cal App 3d 762, 151 Cal Rptr 197 (1978), presents an interesting twist on this theme. As part of its drive to promote the federal equal rights amendment the California Commission on the Status of Women urged *voters* to lobby the legislature in support of the commission's position. *Miller* quoted the distinction in *Stanson v. Mott,* 17 Cal 3d 206, 218, 130 Cal Rptr 697, 551 P2d 1 (1976), between permissible lobbying and impermissible influence of the electorate and noted that *Stanson's* approval of public agency lobbying "was limited to presentations directed to the Legislature and Congress." 87 Cal App 3d at 768. *Miller* stated:

"It is one thing for a public agency to present its point of view to the Legislature. It is quite another for it to use the public treasury to finance an appeal to the voters to lobby their Legislature in support of the agency's point of view. The latter 'undermines or distorts the *legislative* process' just as clearly as "the use of the public treasury to mount an election campaign * * * [distorts] the integrity of the *electoral* process." 87 Cal App 3d at 768-69, quoting *Stanson v. Mott, supra,* 17 Cal 3d at 218 (emphasis added in Miller).

■     Dean Yudof cautions against turning prematurely to the constitutional premises underlying government speech if some other avenue is available. As we have seen, state courts have, for the most part, chosen to examine the issue as one of authority for the challenged expenditure. In this way the question becomes one of statutory construction, that is, whether a particular expenditure is within or without legislative authorization. Yudof, *supra* at 912-13 (1979). The need to face a constitutional issue arises, if at all, only after the court determines what ordinary laws authorize, require or forbid. *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 687 P2d 785 (1984). We turn to an examination of our statutes.

## IV.  THE PERSONAL LIABILITY STATUTE

In 1931, the predecessor of ORS 294.100 was enacted and made a part of the local budget law. Or Laws 1931, ch 380, § 1, p 796. The proscriptive language of that statute remains essentially unchanged.[8]

---

[8] Prior to 1931, Oregon taxpayers had certain limited methods by which to protect themselves against unauthorized expenditures of public funds that might result in increasing their tax burden. In *Carman v. Woodruff*, 10 Or 133 (1882), taxpayers were permitted to sue in equity for the return of money from third persons to whom it was fraudulently dispersed. Taxpayers were also permitted to enjoin unlawful expenditures before they occurred. *Brownfield v. Houser*, 30 Or 534, 49 P 843 (1897). Although *Brownfield* recognized a taxpayer's right to seek an injunction, the court noted in dictum that an action by a taxpayer to compel return of funds *after* the expenditure might not lie. 30 Or at 540.

The *dictum* as applied in *Sears v. James*, 47 Or 50, 82 P 14 (1905). A taxpayer sued to compel the prison superintendent to return public funds he was allegedly expending for personal use, such as home furnishings, groceries and laundry. The court recognized the taxpayer's right to enjoin the expenditures before they occurred, but held "where the fund has already been wasted or paid out, the action to recover it back must be brought by the state or municipality to which it belonged" and not by the taxpayer. 47 Or at 54-55. The court thought this result necessary to avoid subjecting public officials to "interminable litigation." 47 Or at 55. In later cases, however, this rule was disregarded without explanation. Taxpayers successfully sought the return of funds from individuals, either third persons or public officials, who had profited from the unlawful payments. In *Gosso v. Riddell*, 123 Or 57, 261 P 77 (1927), a taxpayer was permitted to maintain a suit against a former county commissioner for the return of amounts paid him for mileage without authority to compensate for such expenditures. In *Young v. Gard*, 129 Or 534, 277 P 1005 (1929), taxpayers recovered money from bond brokers who received public monies in payment for an unauthorized option contract.

Prior to 1931, this court had apparently not considered whether a public official could be personally liable for the return of funds unlawfully expended from which the official did not personally benefit. Other states recognized such liability. *Burns v.*

Since its enactment in 1931, this court has had occasion to cite the predecessor of ORS 294.100 only twice, and we have yet to apply the statute in a case seeking personal liability. In *Tuttle v. Beem,* 144 Or 145, 24 P2d 12 (1933), we held that the directors of a school district violated the local budget law by indebting the district for well drilling when that expenditure had not been submitted to the voters for approval. We made reference to the predecessor of ORS 294.100 as providing personal liability for unauthorized expenditures, although the remedy taxpayers sought was injunction to prevent the unlawful expenditure. *Glines v. Bain,* 157 Or 358, 72 P2d 33 (1937), involved another violation of the local budget law. The school district set teachers' salaries in excess of that approved by voters in the school budget. Taxpayers brought a declaratory judgment action to determine the validity of the district board's resolution fixing compensation in excess of the approved amount. We held that the board had no authority to exceed the budget and cited the predecessor of ORS 294.100. However, as in *Tuttle,* payments had not yet been made, and the issue of personal liability of public officials was not presented.

The Court of Appeals has addressed this statute on previous occasions, all directly involving personal liability of public officials. *Porter v. Tiffany,* 11 Or App 542, 502 P2d 1385 (1972); *Bahr v. Marion County,* 38 Or App 597, 590 P2d 1240 (1979); *Bear Creek v. Hopkins,* 53 Or App 212, 631 P2d 808; and *Umrein v. Nelson,* 70 Or App 104, 688 P2d 419 (1984).

In *Porter v. Tiffany* and *Bear Creek v. Hopkins,* the public officials had neither express nor implied authority for their expenditures. In *Bahr v. Marion County* and *Umrein v. Nelson,* the court remanded the case to determine whether the source of authority defendants relied upon actually authorized the challenged expenditure.

What triggers an obligation to repay improperly expended funds under ORS 294.100, is an expenditure for a "different purpose * * * than authorized by law." Two important questions are, first, whether the expenditures challenged

*Essling,* 163 Minn 57, 203 NW 605 (1925); *Osburn v. Stone,* 170 Cal 480, 150 P 367 (1915); *Webster v. Douglas County,* 102 Wis 181, 77 NW 885 (1899); *Russell v. Tate,* 52 Ark 541, 13 SW 130 (1890).

here were authorized but for the alleged violation of the election law, ORS 260.432, or were unauthorized irrespective of that alleged violation, and second, whether the reference to unauthorized expenditures in ORS 294.100 includes the unlawful use of otherwise authorized expenditures or only expenditures for which no authority exists in the first place. The answer to the second question has importance well beyond the particular kinds of expenditures challenged in this case. As we read ORS 294.100, it includes the unlawful use of otherwise authorized expenditures.

We have already pointed out that the older cases from other states interpreted statutes of authorization restrictively and limited govenment advocacy unless such activity was explicitly authorized. The analysis seems artificial now, however, because with expenditures other than for speech activities, it is unlikely that the same restrictive interpretation would be applied. The better analysis is to recognize that broad grants of authority were intended to be broadly construed. In this way, activities which further a government's or agency's delegated responsibility may be pursued without undue limitation.

On the other hand, broad grants of authority cannot save expenditures illegal under other laws. In this case the same law-making body which delegated authority has prohibited certain uses of public funds. We read the authorizing and prohibiting statutes as a coherent whole, that is, the authorizing statute must be read in conjunction with prohibitions found in other laws so that authority for government action, though broad, extends only to those activities not prohibited by law.

## V. A METHOD OF ANALYSIS

■　　The outline attached at Appendix A is a summary of a method by which to analyze whether expenditures of public funds for government speech purposes are lawful. The first question asks whether authority exists for the expenditure. The second question, does the expenditure conflict with another law, refers, in this case, to the election finance law, ORS 260.432. The third question, by what authority was the expenditure made, contemplates the possibility that a home rule city or county may authorize a speech expenditure by ordinance, the situation in *Anderson v. Boston, supra.* Where

both home rule authority and a prohibiting state statute are involved, a preemption analysis is called for. If, on the other hand, the agency or government unit derives its powers from statute, the question becomes which statute controls. This is a matter of statutory construction. It may be that a more recent statute will repeal an older one by implication. It is also possible that a statute prohibiting expenditure of public funds for some purposes and at some times, being more specific, may control a statute of general authorization. This latter analysis was the one adopted by the Court of Appeals in this case. Finally, if an expenditure clears these hurdles, the question of the constitutionality of government speech is presented. The analysis proceeds first under the state and, if necessary, under the federal constitution.

## VI.   ANALYSIS OF THE CASE

A.   *Authority for the expenditure*

The inquiry in cases brought under ORS 294.100 has been first to examine by what authority public officials expended public funds and then to consider whether the expenditures were within the amounts and for the purposes authorized. In only one case, *Porter v. Tiffany, supra,* was government speech involved and the Court of Appeals did not address the issues which lay beyond the threshhold requirement of authority for the expenditure.

We first examine the authority under which the local boards of health operate. The county governing body is required to establish a county board of health when authorized to do so by a majority of county electors. ORS 431.412. The board, in turn, appoints a public health administrator. ORS 431.418. The composition of the board, the qualifications and terms of its members and administrator, and their powers are regulated by ORS 431.414 through 431.440. The authority of the local public health officials derives from statute.[9]

Defendants assert that the expenditure of public monies was authorized by ORS 431.416, which, at the time

---

[9] Multnomah County has home rule authority. However, local boards of health are created by statute and their authorities are described and limited by statute. The instant case does not present a confrontation between home rule authority and a potentially preemptive state statute. *See, e.g., Anderson v. Boston,* 376 Mass 178, 380 NE2d 628 (1978), *appeal dismissed* 439 US 1060, 99 S Ct 822, 59 L Ed 2d 26 (1979).

relevant to this case, directed district and county departments of health to "[c]onduct activities necessary for the preservation of health or prevention of disease in the area under [their] jurisdiction." ORS 431.416(2). It is pursuant to this statute that the county claims to have maintained its ongoing public health education program about fluoridation for the past 10 years.

The expenditure in this case was for the purpose of promoting fluoridation of the water supply. Health officials did more than attempt to motivate individuals to take measures conducive to preserving their personal health. The populace was not exhorted to floss, brush after meals, avoid sweets, or make any number of other changes in individual behavior that public health officials believed would contribute toward a healthier life. Instead, officials attempted to direct government behavior by soliciting citizens to vote to preserve a particular government policy, fluoridation. Fluoridation is undertaken by governments, not individuals. There may be a question about whether authority to motivate individual behavior in matters of health, arguably encompassed within ORS 431.416, extends to persuading the public to support a chosen government policy.

If the issue were only whether the authorizing statute, ORS 431.416, includes involvement in an election issue, without regard to the effect of ORS 260.432 on the propriety of this expenditure, we might still have difficulty deciding that involvement in the fluoridation project during an election period fell within authorized boundaries. However, ORS 260.432 leaves no doubt about the statutory policy. The legislature has made it clear that whatever authority county health officials have to promote health practices does not extend to requiring public employes to oppose a measure during an election.

B. *Prohibiting legislation*

■ The election finance law limits the political activities of public employes while on the job during working hours. ORS 260.432(2) provides in relevant part that "[n]o public employe shall * * * oppose * * * the adoption of a measure * * * while on the job during working hours." Restrictions also prohibit the solicitation of public employes for political activity. ORS 250.432(1) provides in relevant part that "[n]o

person shall attempt to, or actually, * * * require a public employe to * * * give * * * service * * * to * * * oppose * * * the adoption of a measure * * *."

Defendants submitted an affidavit and exhibits with their motion for summary judgment. The activities in which public employes engaged at the direction of public officials are not in dispute. Defendants explain in their affidavit in support of their motion for summary judgment that after an initiative petition seeking to repeal a city charter amendment to fluoridate the water supply had qualified to appear on the May 20, 1980, primary election ballot, approximately 16 county employes participated in the fluoridation project during regular work hours under the direction of county health officials. Employe activities included public presentations, preparation and distribution of written materials and operation of a telephone "hot line," all of which presented the advantages and safety of fluoridation. In their memorandum in support of their motion for summary judgment, defendants acknowledge that the fluoridation information was purposely one-sided. They assert that in the professional opinion of the health officers only one side, that in favor of fluoridation, survives the rigors of scientific examination. The affiant, Dr. Lawrence, a former Director of the Department of Human Services of Multnomah County, stated that Multnomah County health officials consistently have advocated the implementation and maintenance of fluoridated water systems within the county for at least 10 years prior to this ballot measure.

The county's application for federal grant monies, a copy of which defendants attached to their motion for summary judgment, contains the following statement:

"Despite the fact that fluoridation is both a public health and a political issue, it must be emphasized that federal, state and local laws prohibit the use of federal grant funds, or public employee time on the job, for political activity. It is the applicant's intent to apply grant funds only toward the provision of current, factual, and accurate information about fluoridation to the public."

The grant application contains a summary paragraph as follows:

"A public that is largely uninformed about the purposes and

benefits of fluoridation remains a major obstacle to its implementation in Portland. The political constraints imposed by State law and Multnomah County ordinance on public employees preclude on-the-job political activity. This fact, coupled with the very narrow margin by which fluoridation passed in last Fall's election, makes it imperative that every non-political mechanism and resource available be organized and brought to bear upon the public. Time is of paramount importance to the success of Portland's public information program. If adequate resources can be directed so that the public truly understands the purpose, costs, and benefits of fluoridation, then the desired political outcome should correspond with the desired public health outcome."

Plaintiff, by affidavit, elaborates on the fluoridation project. He states that defendants placed pro-fluoridation advertisements in newspapers before the election but not afterwards, issued a press release announcing the Fluoridation Hotline and the formation of the Scientific Advisory Committee on Fluoridation, and distributed pro-fluoridation literature to many groups and organizations. Defendants do not dispute these facts.

ORS 260.432 prohibits "any person," which includes public officials, from requiring public employes to "oppose * * * the adoption of a measure * * *." The statute contemplates purposive conduct and requires that the "person" who "attempt[s] to, or actually coerce[s], command[s] or require[s]" the public employes to act does so with the purpose of influencing an election.

C. *Resolution*

Issues of fact remain with regard to the alleged violation of ORS 260.432, that is, whether defendants required public employes to engage in these activities with the purpose of opposing the adoption of the anti-fluoridation measure, and if so, whether defendants have any defenses against liability. The decision of the Court of Appeals is affirmed. The case is remanded for further proceedings.

# Appendix A

### Government Speech Analysis

DOES AUTHORITY EXIST FOR EXPENDITURE?
(and was expenditure within confines of
authority: amount, procedures, purpose)

YES ———————————————————————————— NO

unauthorized

DOES EXPENDITURE CONFLICT WITH STATUTE?

YES ———————————————————————————— NO

BY WHAT AUTHORITY WAS EXPENDITURE MADE?

home rule ————————————————— statute

Does statute preempt          Which statute controls?
home rule authority?

YES ——————————— NO        authorizing ——— prohibiting
unauthorized                               unauthorized

DOES EXPENDITURE CONFLICT WITH
STATE CONSTITUTION?

YES ———————————————————————————— NO
unauthorized

DOES EXPENDITURE CONFLICT WITH
FEDERAL CONSTITUTION?

YES ———————————————————————————— NO
unauthorized                    authorized