Argued and submitted August 31, 1987, affirmed April 6, 1988

## AFSCME LOCAL 2975/COUNCIL 75,
*Respondent,*

*v.*

## CITY OF CORVALLIS,
*Petitioner.*

(UP-43-86; CA A42944)

752 P2d 860

Richard D. Rodeman, City Attorney, Corvallis, argued the cause and filed the brief for petitioner.

Barbara J. Diamond, Portland, argued the cause for respondent. With her on the brief were Henry Drummonds, Paul B. Gamson and Kulongoski, Durham, Drummonds & Colombo, Portland.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

NEWMAN, J.

## NEWMAN, J.

The City of Corvallis seeks review of an Employment Relations Board order which determined that the city committed an unfair labor practice when it communicated directly with an employe regarding employment relations during the "period of negotiations." ORS 243.672(1)(i).[1] We affirm.

The facts that ERB found are not in dispute. The city and AFSCME Local 2975/Council 75 (union) negotiated a collective bargaining agreement in September, 1984, effective through June 30, 1987. Under the agreement, the city must give a 14-day written notice of layoff to affected employes.[2] It must also give the union notice of a decision to "contract out" services that bargaining unit employes had provided at least 14 days before the intended implementation date.[3] If, within

---

[1] ORS 243.672(1)(i) provides:

"It is an unfair labor practice for a public employer or its designated representative to do any of the following:

"* * * * *

"(i) Communicate directly or indirectly with employes in the bargaining unit other than the designated bargaining representative during the period of negotiations regarding employment relations, except for matters relating to the performance of the work involved."

[2] Article 26.1 provides:

"*Notice.* In the event it becomes necessary to effect a reduction in the workforce, the City shall notify affected employees in writing at least fourteen (14) calendar days in advance of the effective date of their layoff, except in emergency situations or when the City could not reasonably foresee the necessity of such action."

[3] Article XXIX of the agreement provides:

"Section 29.1. *Notice.* Notice of decision to contract or subcontract work will be provided to the Union when implementation of such decision would affect existing employees' wages, hours, or conditions of work (to the extent such subjects are mandatory subjects of bargaining). Such notice will be provided at least fourteen (14) days prior to the intended implementation date. The notice will include the following information:

"a. Reason for contracting or subcontracting;

"b. Estimated cost;

"c. Type and level of service to be delivered;

"d. Impact on existing employees;

"e. Plan for addressing impact on existing employees;

"f. Anticipated duration;

"g. Selection process and criteria to be used to select contractor or subcontractor.

"The Union specifically waives any and all rights to bargain over the decision

14 days, the union makes a written demand to bargain the impact of that decision, the city must delay implementation pending bargaining.

On March 7, 1986, the City decided to subcontract, or contract out, some custodial services. Arnot, a bargaining unit member, was the only custodial employe affected. On March 10, 1986, his supervisor, Mitchell, met with him and a union representative and delivered a written notice of layoff. The notice listed the reasons for the layoff. It also described Arnot's options, including transfer to a temporary position as a seasonal maintenance worker. Arnot expressed interest in the transfer and said that he wanted to talk with his wife. Later that day, a city representative met with the union and notified it of the city's decision to contract out custodial services and of its plan to address the impact of that decision.

On March 11, Mitchell asked Arnot whether he had talked with his wife. Arnot indicated that she was concerned about eligibility for unemployment benefits. Mitchell said that he would look into it. On March 13, he told Arnot that the temporary job would not affect his eligibility. Arnot said that he would accept the transfer.

By letter dated March 17, 1986, the union demanded impact bargaining on the decision to contract out custodial services. The city received the letter on the morning of March 18. Arnot was unhappy with the union's demand. On March 18, Mitchell told him that he could use a city car to meet with a union representative. After Arnot returned on that day, he

---

to contract or subcontract work.

"Section 29.2. *Right to Bargain Impact.* If the Union does not agree to the City's plan for addressing the impact on existing employees, it may exercise the right to bargain over such impacts to the extent they are mandatory subjects of bargaining. In order to exercise this right, the Union must notify the City in writing within fourteen (14) days after receipt of the notice of decision.

"Section 29.3. *Impact of Bargaining Procedure.* If the Union has properly notified the City of its intent to bargain, the City may not implement such decision until such bargaining is completed. Bargaining is deemed to be completed when the parties reach agreement or, in the event of impasse, thirty (30) days after receipt of the factfinder's report. In either case, the parties intend that such bargaining be completed within a six (6) month period after the Union's notice of intent to bargain, and agree to make every effort to do so by following the schedule outlined below as closely as possible. * * *

"Section 29.4. *Emergencies.* This article does not apply in cases of emergency."

wrote a letter to the union, at Mitchell's suggestion, expressing his dissatisfaction.

On March 18, the parties began impact bargaining. Arnot's layoff was rescinded pending its completion. In May, 1986, the city and the union reached an agreement concerning the city's plan to address the impact of its decision to contract out.

In July, the union filed an unfair labor practice complaint, charging that the city had violated ORS 243.672(1)(i) when Mitchell discussed the transfer with Arnot on March 10, 11, 13 and 18. Under ORS 243.671(1)(i), a public employer commits an unfair labor practice if it, or its designated representative, communicates directly with an employe during a period of negotiations regarding employment relations on a matter not related to the performance of the work involved.[4] ERB concluded that the period of negotiations began March 10. It held that the city had committed an unfair labor practice when it communicated directly with Arnot.[5] ERB also rejected the city's argument that ORS 243.672(1)(i) violates Article I, sections 8 and 20, of the Oregon Constitution.

The city assigns as error that ERB concluded that the period of negotiations began on March 10. Neither the statute nor the agreement defines the term "period of negotiations." The city argues, however, that Section 29.2 and 29.3 of the agreement indicate that the parties intended that the period of negotiations begins when the union makes a formal written demand of its "intent to bargain." The union responds that ERB correctly concluded that the period of negotiations begins when the city gives notice of its decision to contract

---

[4] The city does not claim that Mitchell's communications to Arnot fell within the statutory exception for communications "relating to the performance of the work involved." See ORS 243.672(1)(i).

[5] ERB held:

"Essentially, the contract recognizes the City as the moving party and requires it to make an initial proposal.[6] The City gave its notice and made its proposal on March 10. From that point forward, the City or its agents were prohibited by (1)(i) from communicating with employees about employment relations, which the contract itself establishes in Section 29.3, unless the union waives its right by inaction as provided in Section 29.2."

---

"[6] This is consonant with this Board's case law. See OSEA v. Coos Bay School District 9, Case No. C-159-84, 8 PECBR 8248 (1985)."

out. It asserts that, otherwise, the city could "end-run" its obligation to bargain about impact by negotiating directly with employes during the time when the union is considering whether to demand bargaining.

■■  "Period of negotiations" is an inexact term. When there is no factual dispute, its meaning is a question of law. When an agency interprets an inexact term, we defer to that interpretation if it is consistent with legislative policy. *Springfield Education Assn. v. School Dist.,* 290 Or 217, 224, 621 P2d 547 (1980); *see* ORS 183.482(8)(a). ERB concluded that the period of negotiations began when the city gave the union notice on March 10 of its decision to contract out. That conclusion is consistent with the legislative policy and is correct.[6] The purpose of the statute is to prevent the public employer from undermining the union's status as exlusive bargaining representative by engaging in direct negotiations or other contact with its employe "that substantially impairs the relationship between the [member] and its representative." *See Oregon City School District No. 62 v. Oregon City Education Association,* 5 PECBR 4246, 4251-52 (1981).

■  The city next assigns as error ERB's ruling that the agreement did not authorize the communications that Mitchell made to Arnot. It argues that Article 26.1 required it to notify him of his layoff. ERB, however, correctly ruled that Mitchell's communication regarding the options available to him, including transfer, went beyond the notice requirement of Section 26.1. *See Rogue Community College Classified Employees Association, Chapter 152 v. Rogue Community College,* 9 PECBR 8484 (1986).

■  The city also assigns as error that ERB ruled that

---

[6] The cases which the city cites for the proposition that the duty to bargain does not arise until it receives notice from the union are inapposite. *Teamsters Local 670 v. City of La Grande,* 6 PECBR 4803 (1981), and *Oregon Nurses Association v. Polk County Board of Commissioners,* 3 PECBR 1975 (1978), each involved the timeliness of a union's request to bargain in order to avoid automatic renewal of a contract. *NLRB v. Columbian Enameling & Stamping Company,* 306 US 292, 59 S Ct 501, 83 L Ed 660 (1939), and *NLRB v. Alva Allen Industries, Inc.,* 369 F2d 310 (8th Cir 1966), involved the need for actual notice of a union's intent to bargain before the employer had a duty to bargain. Here, the question is not whether the employer had a duty to bargain with the union before the union demanded bargaining, but whether the employer had a duty *not* to bargain with an individual employe during the 14 days after the employer notified the union of its decision to contract out.

ORS 243.672(1)(i) does not violate Article I, section 8.[7] It argues that, contrary to the guarantee of Article I, section 8, the law restricts the city's right to speak "on any subject whatever." ERB rejected the argument, reasoning that unfair labor practice liability lies with the public employer, not its "designated representatives," *see* ORS 243.650(18),[8] and that public employers do not enjoy Article I, section 8, rights. We agree. Article I, section 8, protects persons against "laws" that restrict speech rights. It does not protect the city as a public employer, as defined by ORS 243.650(18).[9] *See State ex rel Emerald PUD v. Joseph,* 292 Or 357, 362, 640 P2d 1011 (1982). ORS 243.671(1)(i) does not violate Article I, section 8.[10]

Affirmed.

---

[7] Article I, section 8 provides:

"No law shall be passed restraining the free expression of opinion or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

[8] ORS 243.650(18) provides:

" 'Public employer' means the State of Oregon or any political subdivision therein, including cities, counties, community colleges, school districts, special districts and public and quasi-public corporations. 'Public employer' includes any individual designated by the public employer to act in its interests in dealing with public employes."

[9] The city cites no cases to support its assertion that the government, as a public employer, is protected by Article I, section 8. In the only case discussing government speech, the Supreme Court ruled that public officials could be held personally liable for expending public funds to oppose an antifluoridation ballot measure when that speech and expenditure of funds violated election finance laws limiting the political activities of public employes in their public capacity. *Burt v. Blumenauer,* 299 Or 55, 699 P2d 168 (1985). The court stated:

"Neither the free speech clauses, nor principles of representational democracy require that governments, as such, refrain from speech entirely. However, assuming governments may engage in some forms of speech, they are still prohibited from advocacy intended to perpetuate themselves in power." 299 Or at 67.

The court made no mention of a governmental right to speak, and its holding implicitly recognized the constitutionality of legislative restrictions on government speech—in that case, the election finance laws. *See* Yudof, *When Government Speaks: Politics, Law and Government Expression in America,* 44-45 (1983).

[10] The city's fourth assignment of error, that ORS 243.672 violates the Privileges and Immunities Clause of Article I, section 20, is also without merit.