CITIZENS TO PROTECT PUBLIC FUNDS AND DUDLEY KIMBALL, PLAINTIFFS-APPELLANTS, v. BOARD OF EDUCATION OF THE TOWNSHIP OF PARSIPPANY-TROY HILLS, DEFENDANT-RESPONDENT.

Argued June 8, 1953—Decided June 25, 1953.

*Mr. Worrall F. Mountain, Jr.,* argued the cause for appellants (*Mr. Simon Kasdin,* attorney).

*Mr. John H. Grossman* argued the cause for respondent.

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J.   Upon plaintiffs' petition, in which defendant joined, we certified the judgment entered in the Law Division of the Superior Court dismissing plaintiffs' amended complaint.

Defendant proposed a program for enlarging several school buildings and to issue bonds in the amount of $560,000 to finance the first half of the program.   There being existing debt limitations, approval of the proposal, as required by *R. S.* 18:5–86, as amended, was first obtained from the State Commissioner of Education and the Local Government Board before the proposal was submitted, as is also required by that statute and as was in any event required by *R. S.* 18:7–73, to a referendum vote at an election held December 2, 1952 when the proposal was adopted by a vote of 875 to 542. However, the defendant board did not prior to that election submit the proposed building expansion plans to the local planning board for approval as to "location, character and

extent thereof" according to *R. S.* 40:55–7, as amended by *L.* 1948, *c.* 464, and *L.* 1949, *c.* 157.

When the building program was authorized by resolution adopted August 27, 1952, the 1952-1953 school budget included an appropriation captioned "Current expenses, administrative, architecture fees, preliminary." Some $358.85 of this appropriation was spent by defendant for "printing, artist's work and postage" to print and circulate an 18-page booklet entitled "Read the Facts Behind the Parsippany-Troy Hills School Building Program." All but one page of the booklet depicts in graphic form, effectively illustrated to arrest the reader's attention, such facts as the growth of the grade school population (from 1945, doubled, and by 1956 to be tripled), the inadequacies of existing facilities, the proposed immediate additions, with architectural sketches, to two schools, other expansions planned to be deferred until 1955, the aggregate and annual costs, principal and interest, of the immediate program and the effect upon taxes of such cost. However, there also appears on the cover and on two of the pages "Vote YES," and "Vote YES—December 2, 1952," and an entire page which, except for an accompanying sketch, we reproduce:

"What Will Happen if You Don't Vote Yes?
Double Sessions ! ! !
This will automatically CHEAT your child of 1/3 of his education (4 hours instead of 6)
Yearly school changing and hour long Bus rides will continue for many children.
Morning Session (8:30 - 12:30)  Children will leave home ½ hour earlier
Afternoon Session (12:30 - 4:30) Children will return home 1½ hours later (many after dark)
Children in some families would be attending different sessions (depending upon grade)
Transportation costs will increase (could double) with 2 sets of bus routes per day.
Temporary room rentals will continue ($4,000 per year)
Double use of equipment will necessitate more rapid replacement.
NOTE: Operating expenses will continue to rise as the enrollment increases (more teachers, more supplies and equipment for children. THIS WILL BE SO WHETHER WE BUILD OR NOT.)"

On December 1, the day before the referendum election, radio station WMTR broadcast a 15-minute panel discussion of the proposed building program as one of the station's "public interest" programs. The panel was composed of a member of the defendant board of education and two members of a citizens advisory committee which assisted the board in the formulation of the building program. The superintendent of schools, with the approval of the board's president, advised the principals of the several schools equipped with public address systems or radios that school children in grades four to eight might be permitted to hear the broadcast. According to the numerous affidavits of teachers offered to support defendant's motion for dismissal, some turned on the program and others did not, the reception was unsatisfactory in many instances and the broadcast for that reason was not heard, many children paid no attention to it, and the reaction of at least one class was why "do we have to listen to this sort of thing." And it appears without contradiction that the panel discussion was purely informative as to the scope of the building program and that there was no exhortation to vote affirmatively for the proposed bond issue at the referendum election the next day.

On the oral argument in this court we were told that the substance of what plaintiffs sought by the amended complaint was a judgment declaring that the project could not be legally consummated for failure of the defendant prior to the referendum to submit the building plans to the local planning board according to R. S. 40:55–7, as amended, and also a judgment declaring that any action of the defendants in using public funds "to influence elections" is illegal and the "propagandizing of school children" a violation of N. J. S. A. 18:14–78.1, L. 1948, c. 228, as amended by L. 1952, c. 268, which amendment, among other prohibitions, provides, "Nor shall officials or employees of public schools request or direct such pupils to engage in activities which promote, favor, or oppose any bond issue proposal or other public question submitted at any general or municipal or school election."

██ We see no merit in the point that the submission to the planning board required by *R. S.* 40:55–7, as amended, must precede the referendum election. That section, as amended, requires that when a "public improvement. is to be constructed or authorized by a school board," "The same procedure and limitations" applicable to municipal governing bodies and others enumerated in the section "shall apply." These are that "Whenever the planning board shall have adopted the master plan * * * no * * * public building or structure * * * or any improvement * * * shall be constructed or authorized * * * until the location, character and extent thereof has been submitted to the planning board for approval. * * * The failure of the planning board to act * * * within forty-five days from and after the date of official submission * * * shall be deemed approval" and, in any event, "Such school board may overrule a disapproval of the planning board by a recorded vote of not less than two-thirds of its entire membership."

The nature of the inquiry and the consequences of a disapproval by the State Commissioner of Education or the Local Government Board are very different. The State Commissioner concerns himself with the questions whether "existing educational facilities in such school district are or within five years will be less than eighty per centum (80%) adequate" and whether "the new educational facilities to be financed pursuant to such proposal or ordinance will within ten years be fully utilized," *R. S.* 18:5–86(*c*); and the Local Government Board is concerned that "the amounts to be expended for the new educational facilities to be financed pursuant to such proposal or ordinance are not unreasonable or exorbitant, and that issuance of the bonds mentioned and described in such proposal or ordinance will not materially impair the credit of any municipality comprised within such school district or substantially reduce its ability during the ensuing ten years to pay punctually the principal and interest of its debts and supply essential public improvements and services." *R. S.* 18:5–86(*d*). The consents of the State

Commissioner of Education and of the Local Government Board are expressly made conditions precedent to the submission of the proposal to the electorate. The failure of the Legislature, either in *R. S.* 18:5–86, *R. S.* 18:7–73 or *R. S.* 40:55–7 to make compliance with the latter statute also a condition precedent to the submission of the proposal to a referendum, is persuasive that the Legislature did not intend such submission as an additional requirement. And, as noted, disapproval of the improvement by the planning board may be overruled by a two-thirds vote of the members of the board of education. Logically, indeed, there could be no purpose in submitting the proposed improvement to the planning board for its consideration until the procedures for authorizing the financing of the improvement were completed and the ability to pay for the improvements reasonably established.

■ The contention that there was error in the denial of a declaratory judgment as to the legality of the expenditures for the printing and distribution of the booklet, and the exposure of school children to the radio broadcast is premised solely upon the assertion that the same things may be done or attempted by the defendant board in connection with the balance of the building program upon its submission to the electorate for adoption. It was conceded on the oral argument that the actions under attack, if improper, would not suffice to invalidate the election already held. But the actions taken, it is admitted, had particular relation only to the proposal before the electorate on December 2, 1952, and for aught that appears they seem to have spent their force. The booklet on its face shows that it is not intended for use in connection with future plans for completing the balance of the expansion program. Plainly, then, any issues as to both the booklet and the radio broadcast are moot and the resolution of new, or even similar, issues as to other actions attempted by the defendant for a similar purpose in the future must await the event.

Nevertheless, the importance of the question makes appropriate our comment upon the actions taken. *Cf. United*

*States v. W. T. Grant Company*, 345 *U. S.* 629, 73 *S. Ct.* 894, 97 *L. Ed.* —— (1953).

Every school district is obligated to provide suitable school facilities and accommodations for all children who reside in the district and desire to attend the public schools therein. *R. S.* 18:11–1. The importance of the proper discharge of this responsibility cannot be overemphasized. "A school district is a part of the machinery of government, as much so, to all intents and purposes, as a town or township. When the moral and intellectual interests of the people are considered, a school district may well be regarded as ranking as high in importance as that of any other territorial division. Through its agents it deals both with the property and the liberty of citizens; more than this, towns and townships do not do." *Commissioners of Public Instruction v. Fell*, 52 *N. J. Eq.* 689, 691 (*Ch.* 1894). The elected board of nine in a township school district who comprise the body corporate to represent the district and its inhabitants, *R. S.* 18:7–4, *Landis v. School District* 44, 57 *N. J. L.* 509 (*Sup. Ct.* 1895), "with the previous authority of a vote of the legal voters of the district * * * may * * * erect * * * enlarge, improve * * * school buildings and borrow money therefor with or without mortgage," *R. S.* 18:7–73.

■ There is no express statutory provision authorizing the expenditure by boards of education of public funds in the manner done by the defendant board for the printing and distribution of the booklet. The power, however, within the limits hereafter stated, is to be found by necessary or fair implication in the powers expressly conferred by *R. S.* 18:7–77.1 which enumerates the permissible items which may be included in the annual budget, and more particularly as incident to "(b) the building, enlarging, repairing or furnishing of a schoolhouse or schoolhouses."

The power so implicit plainly embraces the making of reasonable expenditures for the purpose of giving voters relevant facts to aid them in reaching an informed judgment when voting upon the proposal. In these days of high costs,

projects of this type invariably run into very substantial outlays. This has tended to sharpen the interest of every taxpayer and family man in such projects. Adequate and proper school facilities are an imperative necessity, but the large additional tax burden their cost often entails concerns taxpayers that they be obtained with the maximum economy of cost. At the same time the complexities of to-day's problems make more difficult the task of every citizen in reaching an intelligent judgment upon the accommodation of endurable financial cost with the acknowledged need for adequate education. The need for full disclosure of all relevant facts is obvious, and the board of education is well qualified to supply the facts. But a fair presentation of the facts will necessarily include all consequences, good and bad, of the proposal, not only the anticipated improvement in educational opportunities, but also the increased tax rate and such other less desirable consequences as may be foreseen. If the presentation is fair in that sense, the power to make reasonable expenditure for the purpose may fairly be implied as within the purview of the power, indeed duty, of the board of education to formulate the construction program in the first instance. And the choice of the media of communication to give such facts, whether by the use of a booklet, as in this case, radio broadcast, newspaper advertising, or other means, is within the discretion, reasonably exercised, of the board of education. The booklet under attack here, in 17 of its 18 pages, fairly presents the facts as to need and the advantages and disadvantages of the program, including the tax effect of its cost, and if it stopped there, none could fairly complain that the reasonable expenditure made for its preparation and distribution was without the scope of the implied power.

But the defendant board was not content simply to present the facts. The exhortation "Vote YES" is repeated on three pages, and the dire consequences of the failure so to do are over-dramatized on the page reproduced above. In that manner the board made use of public funds to advocate one side only of the controversial question without

affording the dissenters the opportunity by means of that financed medium to present their side, and thus imperilled the propriety of the entire expenditure. The public funds entrusted to the board belong equally to the proponents and opponents of the proposition, and the use of the funds to finance not the presentation of facts merely but also arguments to persuade the voters that only one side has merit, gives the dissenters just cause for complaint. The expenditure is then not within the implied power and is not lawful in the absence of express authority from the Legislature. In *Mines v. DelValle*, 201 *Cal.* 273, 257 *P.* 530, 537 (*Cal. Sup. Ct.* 1927), it was said:

"It must be conceded that the electors of said city opposing said bond issue had an equal right to and interest in the funds in said power fund as those who favored said bonds. To use said public funds to advocate the adoption of a proposition which was opposed by a large number of said electors would be manifestly unfair and unjust to the rights of said last-named electors, and the action of the board of public service commissioners in so doing cannot be sustained, unless the power to do so is given to said board in clear and unmistakable language."

And in *Elsenau v. City of Chicago*, 334 *Ill.* 78, 165 *N. E.* 129, 131 (*Ill. Sup. Ct.* 1929), appears the following:

"The conduct of a campaign, before an election, for the purpose of exerting an influence upon the voters, is not the exercise of an authorized municipal function and hence is not a corporate purpose of the municipality."

We do not mean that the public body formulating the program is otherwise restrained from advocating and espousing its adoption by the voters. Indeed, as in the instant case, when the program represents the body's judgment of what is required in the effective discharge of its responsibility, it is not only the right but perhaps the duty of the body to endeavor to secure the assent of the voters thereto. The question we are considering is simply the extent to and manner in which the funds may with justice to the rights of dissenters be expended for espousal of the voters' approval of the body's judgment. Even this the body may

do within fair limits. The reasonable expense, for example, of the conduct of a public forum at which all may appear and freely express their views pro and con would not be improper. The same may be said of reasonable expenses incurred for radio or television broadcasts taking the form of debates between proponents of the differing sides of the proposition. It is the expenditure of public funds in support of one side only in a manner which gives the dissenters no opportunity to present their side which is outside the pale.

We acknowledge that the limits here pronounced are not suggested in the decision of the former Court of Errors and Appeals in *City Affairs Committee of Jersey City v. Jersey City*, 134 *N. J. L.* 180 (1945). We are persuaded, however, that simple fairness and justice to the rights of dissenters require that the use by public bodies of public funds for advocacy be restrained within those limits in the absence of a legislative grant in express terms of the broader power.

We note one other irregularity of the defendant board in this connection. The appropriation for "Current expenses, administrative, architecture fees, preliminary" plainly is not a "statement so itemized as to make the same readily understandable" within the requirement of *N. J. S. A.* 18:7–77.1, at least as related to a disclosure that the expenditure for the printing and circulation of the booklet was intended to be embraced therein.

Finally, as to the plaintiffs' contention that the exposure of the school children to the radio broadcast of December 1st violated *N. J. S. A.* 18:14–78.1, it is necessary only to say that upon the affidavits before the trial court there was nothing to show that the provisions of that section were in anywise violated.

Judgment affirmed.

HEHER, J., concurring. Once it is conceded that the local board of education is empowered to submit the merits of the issue to the electorate at public expense, the judicial supervisory jurisdiction is concerned only with the limitations of the power and the containment of its exercise within

the bounds of reason. Censorship is not of the judicial province. *City Affairs Committee v. Board of Com'rs of Jersey City*, 134 *N. J. L.* 180 (*E. & A.* 1946).

The mode and manner of the performance of the local function, if directed to an end within the allotted sphere of action, is not a justiciable question. Action transcending the dictates of reason constitutes an excess of power correctible by the judicial process; but mere matters of policy, propriety, expediency, taste and delicacy in the way of action for the attainment of a lawful end are not subject to the least judicial superintendency. Debatable questions as to reasonableness of policy and procedure are not for the courts but for the local authority. We do not substitute our judgment in this regard for the discretion of the local administrative body, reasonably exercised; the judicial function is the correction of arbitrary and unreasonable action and abuse of power. *Salisbury v. Borough of Ridgefield*, 137 *N. J. L.* 515 (*Sup. Ct.* 1948). This is fundamental in the separation of powers; the judicial province is to confine the local agency within its delegated sphere of action. If the question of reasonableness be fairly arguable, then the doubt is to be resolved in favor of the action taken. If the object in view be lawful, the choice of means to that end rests in the sound discretion of the administrative authority; and there can be no judicial interference unless the mode of execution itself be contrary to law or palpably unreasonable or wanting in good faith. *N. J. Good Humour, Inc., v. Board of Com'rs of Bradley Beach*, 124 *N. J. L.* 162 (*E. & A.* 1940).

There can be no doubt that the thing done here was designed to and did in fact serve an essential public purpose. The local board of education is under a peremptory duty to provide "suitable school facilities and accommodations for all children who reside in the district and desire to attend the public schools therein," including "proper school buildings, together with furniture and equipment, convenience of access thereto, and courses of study suited to the ages and attainments of all pupils between the ages of five and twenty

years"; and a failure "to provide such facilities or accommodations" may incur the loss of all state school aid, not to mention the personal consequences attending the failure of official duty. *R. S.* 18:11–1; *R. S.* 18:11–2, as amended by *L.* 1936, *c.* 88, *p.* 306.

It was conceded on the oral argument that 90% of the brochure constituted a fair presentation of the facts, and was unexceptionable. Complaint is directed to the "exhortation" to vote "yes," as in the nature of advocacy and therefore beyond the function of the administrative body. The court deems objectionable this and what is termed over-dramatization of "the dire consequences of the failure so to do," as the use of public funds for advocacy of "one side only of the controversial question without affording the dissenters the opportunity by means of that financed medium to present their side." The court distinguishes between "the presentation of facts merely" and "arguments to persuade the voters that only one side has merit," suggesting that the funds entrusted to the local authority "belong equally to the proponents and opponents of the proposition." "Presentation of facts" is within the implied power; but "arguments to persuade the voters" are not.

I consider this an arbitrary differentiation at variance with the realities and the essential content of the power. If the board may present the "facts" bearing upon the merits of the submission, on what consideration is it to be restrained from giving expression to its experienced judgment as to the existence of a public exigency and the course that will serve the need? It is all for the enlightenment of the electorate in aid of the just determination of an issue related to the public interest. There is no element of compulsion; it is purely informative. I cannot accept the proposition that there may be a presentation of the facts bearing upon the need, but not their assessment by the authority to whom the administration of the school system has been entrusted and whose judgment is informed by actual experience in the performance of the statutory duty. And was it not proper for the board to conclude with the statement that,

if the need is to be served, the question submitted must be answered in the affirmative?

If there is to be a declaratory judgment denying the power as here exercised, I dissent. I would affirm the judgment of dismissal.

HEHER, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For reversal*—None.