540 So.2d 147 (1989)
PALM BEACH COUNTY and Jackie Winchester, Supervisor of Elections of Palm Beach County, Appellants,
v.
George L. HUDSPETH, Jr., John O. Farsons, Mary L. Reilly, George Dunton, William Laminsky, Sarah Laminsky, Sol Silverman, Jean Hammer, International Brotherhood of Electrical Workers, Local Union 323 and Palm Beach County AFL-CIO, et al., Appellees.
No. 88-2910.
District Court of Appeal of Florida, Fourth District.
March 8, 1989.
Clarification Denied April 19, 1989.
*148 Glen J. Torcivia, West Palm Beach, for appellants.
Richard A. Sicking of Kaplan, Sicking & Bloom, P.A., West Palm Beach, for appellees.
Adrian Winterfield of Adrian Winterfield, P.A., Palm Beach, appellee, pro se.
Carl V.M. Coffin, West Palm Beach, for amicus curiae, City of West Palm Beach.
Thomas A. Sheehan, III of Moyle, Flanigan, Katz, Fitzgerald & Sheehan, P.A., West Palm Beach, for amicus curiae, Citizens for Better Health Care, Inc.
James R. Wolf, Gen. Counsel, Florida League of Cities, Inc., Tallahassee, Paul J. Nicoletti, Gen. Counsel, Palm Beach County Mun. League, Inc., West Palm Beach, and William J. Roberts, Gen. Counsel, Florida Ass'n of Counties, Inc., for amicus curiae, Florida League of Cities, Inc., and Palm Beach County Mun. League, Inc.
James K. Green of Green, Eisenberg and Cohen, West Palm Beach, for amicus curiae, American Civil Liberties Union of Florida, Inc., Palm Beach Chapter.
HERSEY, Chief Judge.
The controversies which we address in this appeal involve the validity of county action in obtaining voter approval of an independent special taxing district to provide health care and the propriety of expenditures made by the county in promoting passage of the Health Care Act.
This effort to create a county-wide health care district began in 1987. At that time there were in existence three separate independent health care districts located in various parts of the county and the central and northeastern portions of the county constituted a dependent health care district. Each independent district was authorized to and did collect a special tax to raise money to pay for the distribution of health care services within each particular district. These taxes were in addition to the county's ten mill tax (which is the maximum millage that a county is permitted by law to impose). During the same period, the county utilized a portion of its tax collections to provide health care services so that the residents within independent districts were being taxed twice for health care services.
Chapter 87-450, Laws of Florida, provided for the creation of a unified health care district encompassing all of Palm Beach County. The technical method employed to create the district was to expand the boundaries of one of the districts to include the entire county and to abolish all other health care districts. The county referendum, required by the statute, was defeated at the polls in March of 1988.
Subsequently, various changes were made in the plan to meet objections which had been voiced by opponents of the unified health care district.
*149 The legislature then adopted Chapter 88-460, Laws of Florida, which generally followed its predecessor except that the millage cap imposed on the district was reduced from three to two mills and the governing body was expanded to provide for more equitable representation.
As a result of the foregoing, the Palm Beach County Commission caused the following ballot question to be placed on the November 8, 1988, ballot:
PALM BEACH COUNTY HEALTH CARE ACT
Shall the Palm Beach County Health Care District be established to plan, fund and coordinate the effective delivery of quality health care services, including trauma care, indigent medical care, home health care, emergency, and other medical services through consolidation of districts into one comprehensive system and be authorized to levy annually an ad valorem tax not to exceed 2 mills for cost effective health care services for the people of Palm Beach County?
Yes ____
No ____
In addition, the county authorized the expenditure of funds, not to exceed $50,000, to promote the passage of the Health Care Act, and county employees, as part of their official duties, were encouraged to accept speaking engagements to promote passage of the Act.
Appellees then sought an injunction to remove the Health Care District question from the ballot and to prevent the county from expending funds to promote it.
After notice and hearing, an order was entered requiring that the question be removed from the ballot and prohibiting the county from distributing materials to promote passage of the Act. The former constituted a mandatory injunction and the latter a traditional "restraining order" or injunction.
This court stayed the injunction so that the question remained on the ballot and the Health Care Act was approved by a majority of the voters on November 8, 1988.
Thus, while the correctness of the lower tribunal's "Temporary Restraining Order" or more correctly, temporary injunction, is technically moot since the events and activities which it encompassed are history, we have elected to retain jurisdiction in order to address the question of whether passage of the Health Care Act was tainted by the ballot language or by inappropriate expenditures made to advocate its passage.
On the first question, there is a considerable body of law to assist this court, if only by analogy and deduction, in determining whether the ballot language is legally sufficient. The same cannot be said of the question of the propriety of expending taxpayers' money to promote (or to oppose) the passage of particular legislation. On this question, there is a paucity of precedent in this or any other jurisdiction.

THE BALLOT LANGUAGE
The preliminary test which a ballot summary must meet is established by the Florida Election Code, section 101.161(1), Florida Statutes (1987), which provides in pertinent part:
Whenever a constitutional amendment or other public measure is submitted to the vote of the people, the substance of such amendment or other public measure shall be printed in clear and unambiguous language on the ballot after the list of candidates... . The substance of the amendment or other public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure.
Thus, the requirements are that the summary consist of an explanation of the "chief purpose" of the particular legislation and that the language be "clear and unambiguous."
Opponents of the Health Care Act, represented by appellees, contend that the summary in question violates these requirements in several respects.
The ballot summary speaks of the "effective delivery of quality health care services." Appellees object to the use of "buzz words" such as these, alleging that they *150 are ambiguous, are designed to promote rather than to inform and do not describe the substance of the proposal. The trial court rejected appellees' position, pointing out that the underlying legislation utilized similar terminology.
The terms "effective delivery" and "quality health care services" are not inherently ambiguous. As used in the summary, they rather obviously impart a comparative flavor to the provision in which they are contained. Thus, the import of the provision is that the unification of health care districts will permit more effective delivery of services than is possible without such unification. It further indicates that health care services will be of higher quality because of, or as a result of, unification. These are both justifications for adoption of the Act and explanatory of its chief purpose. The trial court correctly rejected appellees' contrary position.
Another argument posed by opponents of the Act is that the summary is fatally flawed because of the misleading effect of use of the term "consolidation." The substance of this argument is that voters in that portion of the county not presently within the boundaries of one of the three independent health care districts would be misled because, as to them, the Act really "created" a taxing district rather than "consolidated" taxing districts. In other words, the Act imposed upon citizens outside of the existing independent districts a health care tax for the first time, whereas the ballot summary could be construed as exempting them from the new district and any such tax, if it did in fact only "consolidate" existing districts.
Other than on a purely semantic level, which we will briefly treat, the harm that accrues from this is identical, or nearly so, to the consequences which appellees describe in an entirely separate and distinct argument based upon other perceived inadequacies in the ballot summary language. Because they are related in a cause and effect sense and thus, in our view, constitute but two sides of the same equation, we will consider them together.
There is something to be said for the proposition that use of the term "consolidate" is inherently misleading if in fact it is required to convey the meaning "create" to some but not all of its readers. While the distinction is semantic, the impact of a "new" as opposed to a "different" tax is real rather than technical. Like everyone else in Palm Beach County, taxpayers outside of the boundaries of the three existing independent health care districts pay a certain amount which will be devoted to providing health care services. Unlike those within the districts, however, they do not pay a separate and additional amount imposed by a health care district. Under the Act, they will do so for the first time. The question is whether this is made sufficiently clear by the language chosen. Does use of the term "consolidate" make it less than clear? Does the paucity of explanatory language as to the make-up and powers of the governing body add to the confusion to the extent that the Act must be struck down as parading under false colors?
While not controlling, we hold that use of the term "consolidate" rather than "create" would not, in and of itself, justify setting the election aside. It was, in fact, a technically correct use of that term because that portion of the county not included within one of the three independent health care (taxing) districts was properly referred to as a dependent district. The summary refers to establishing a unified Health Care District "through consolidation of districts into one comprehensive system" which, as we have pointed out, was technically correct.
The more important question is whether use of the term "consolidate" coupled with alleged errors of omission  what the summary does not say  fatally infects the election.
Our supreme court, in Hill v. Milander, 72 So.2d 796, 798 (Fla. 1954), explained that "[w]hat the law requires is that the ballot be fair and advise the voter sufficiently to enable him intelligently to cast his ballot." There are two perspectives from which the summary of any proposition to be placed on the ballot may be viewed and each has both *151 negative and positive elements. The summary must not have a tendency to mislead the voters, whether by what it says or by what it fails to say. The second perspective from which ballot summary language is to be viewed concerns its informational content, i.e., whether the summary gives the voter fair notice of the main purpose of the legislation so that the voter knows what decision is being made.
Askew v. Firestone, 421 So.2d 151 (Fla. 1982), provides an example of a ballot summary deemed to be misleading. The summary in that case reads: "Prohibits former legislators and statewide elected officers from representing other persons or entities for compensation before any state government body for a period of 2 years following vacation of office, unless they file full and public disclosure of their financial interests." Id. at 153. This language, taken alone and out of context, is not necessarily deceptive. However, there was already in place an absolute prohibition against former legislators and statewide elected officers appearing before state agencies for two years following vacation of office. Thus the proposed amendment liberalized this provision while apparently imposing an impediment to such appearances (filing of a financial disclosure). The Askew court struck the provision from the ballot as "misleading to the public concerning material changes to an existing constitutional provision... ." 421 So.2d at 156. The chief purpose of the act as portrayed by the summary language was to limit appearances before state agencies by former state employees. The actual purpose was to eliminate the prohibition against such appearances.
The same cannot be said of the ballot summary of the Health Care Act. The "chief purpose" of the Act was to create a county-wide health care district. The perceived tendencies to mislead involve questions concerning the impact of the special tax and the authority and nature of the governing body. These peripheral issues, while of legitimate concern, do not have a direct bearing on the main purpose of the Act, although they are essential to the implementation of that purpose. As our supreme court pointed out in Carroll v. Firestone, 497 So.2d 1204 (Fla. 1986), it is not necessary to explain every ramification of proposed legislation, only the chief or main purpose.
This holding pertains as well to the argument that a fourth special health care district must be created before it can be "consolidated" with the three existing districts. Technical shortcomings of such mechanical details simply do not rise to the level of "clear and conclusive defects" required to invalidate an election.
Several of the cases relied on by appellees can be readily distinguished on that basis. For example, in Kobrin v. Leahy, 528 So.2d 392 (Fla. 3d DCA), rev. denied, 523 So.2d 577 (Fla. 1988), the voters were asked to eliminate a particular board in the same election at which they were electing persons to serve on that board. The ballot summary referred neither to elimination of the board nor to the apparent inconsistency in the two courses of action which the election forced voters to take. No such internal inconsistency was foisted upon the voters by the Health Care Act.
Pointing out that many details of a proposed plan were not explained on the ballot, the supreme court nonetheless held a ballot summary adequate in Miami Dolphins, Ltd. v. Metropolitan Dade County, 394 So.2d 981 (Fla. 1981). The court noted that it was common knowledge that details regarding any proposed referendum are grist for the media's mill for months in advance of an election. Thus it was "idle to argue" that every proposal on a ballot must appear at great and undue length. Id. at 987.
The ballot summary is limited to seventy-five words. The raison d'etre of the summary is to give the voter an accurate picture of the main purpose of the proposed legislation. As population grows and technology advances, the complexity of problems with which government must cope increases proportionately. The sheer scope of a particular legislative solution to a modern problem may therefore relegate all but the most crucial and skeletal elements of *152 the legislation to the realm of voter self-education. That education must necessarily be found outside the voter's booth and preferably well in advance of the election.
The ballot summary involved here does not explain the nature and extent of authority of the governing body, does not tell voters in the northeast corridor that they will be subjected for the first time to an assessment of two mills as health care district taxes which will be in excess of the ten mill limitation imposed upon counties, whether the district is dependent or independent, or whether it is authorized to issue certain bonds.
The length of the preceding paragraph mentioning just a few of the details omitted from the ballot summary is exactly seventy-five words. Can it seriously be contended that a ballot summary not only must explicate the main purpose of proposed legislation, but also must furnish various details that are of particular interest to one or more groups of voters? We answer this question in the negative and find no constitutional infirmity in the ballot summary of the Health Care Act.

EXPENDITURE OF FUNDS
As noted earlier, the Palm Beach County Commission approved the expenditure of $50,000 to promote passage of the Health Care Act. The issue is the propriety of the expenditure of public funds for the purpose of supporting (or opposing) political issues.
Appellants (the county and the elections supervisor) look for authority to section 125.01, Florida Statutes (1987), which sets forth the general powers of county government. Section 125.01(1)(w) allows the county to "[p]erform any other acts not inconsistent with law, which acts are in the common interest of the people of the county, and exercise all powers and privileges not specifically prohibited by law." Section 125.01(3)(b) provides for liberal construction of the section "to secure for the counties the broad exercise of home rule powers authorized by the State Constitution."
In Speer v. Olson, 367 So.2d 207 (Fla. 1978), the supreme court held that section 125.01(1) gives to a county's governing body the power to carry on county government. The court stated that unless the legislature has preempted a particular subject by general or special law, the county has full authority to act in exercise of home rule power. Accordingly, the court found that the county had the power to issue a category of general obligation bonds.
Appellants' position that the county has the authority to expend public funds to promote the passage of an ordinance deemed by it to be in the public interest finds support in a line of Attorney General opinions. Opinions of the Attorney General are considered persuasive, but do not constitute binding authority on the courts of Florida. Beverly v. Division of Beverage of the Department of Business Regulation, 282 So.2d 657 (Fla. 1st DCA 1973).
In 1974 Op. Att'y Gen. Fla. 074-113, (April 10, 1974), the Attorney General concluded that a municipality may spend municipal funds to purchase newspaper advertisements supporting or opposing the repeal of a county utilities tax. In 1978 Op. Att'y Gen. Fla. 078-41, (March 9, 1978), the decision was that municipal funds may be expended to support a bond issue to raise funds to acquire and develop parks and recreation areas. In 1984 Op. Att'y Gen. Fla. 084-17, (February 9, 1984), the Attorney General concluded that members of the state House of Representatives are not barred by law from speaking against a proposed amendment to the state constitution, and that if the legislature deemed expenditure of public funds to support or oppose adoption of an amendment or to disseminate information about it to be in the public interest, then the legislature could authorize such expenditures, provided they are authorized by law or resolution, made pursuant to a budget, or otherwise appropriate. In 1986 Op. Att'y Gen. Fla. 086-87, (October 7, 1986), the Attorney General said that unless restricted by, and to the extent consistent with, general or special law, the Brevard County Commission may expend public funds to advertise its position in an upcoming referendum, provided that prior to making such an expenditure, *153 the Brevard County Commission makes appropriate legislative findings as to the purpose of the expenditure and the benefits which would accrue to the county therefrom.
These Attorney General opinions emphasize, and we echo, that there are no Florida cases or legislative acts that either specifically or by necessary implication prohibit the expenditure of public funds for any lawful purpose found by a unit of local government to be in the public interest, provided that government otherwise has the power or authority to act in the matter under consideration. It follows that questioned expenditures must be tested on a case-by-case basis; the inquiry is one for the judicial branch, and the issue to be resolved is whether the particular expenditure offends the Constitution of the State of Florida, laws of the State of Florida, or fundamental concepts of justice and fair play.
Article I, section 1, of the Florida Constitution provides that political power is inherent in the people and that this power is not to be denied or impaired by the enunciation of any other rights. To the extent, then, that a proposed expenditure of public funds infringes upon or tends to infringe upon the political power reserved to the people, that expenditure will be deemed constitutionally impermissible.
Finding little guidance in Florida law for the application of this standard, we turn to foreign experience for enlightenment.
In the case of Citizens to Protect Public Funds v. Board of Education of Parsippany-Troy Hills Tp., 13 N.J. 172, 98 A.2d 673 (1953), the New Jersey Supreme Court upheld the dismissal of a suit for declaratory judgment. At issue was whether a school bond election was invalid and whether use of public funds to advocate a favorable vote on the bond issue was illegal. Writing for the court was Justice William J. Brennan, Jr., (later Supreme Court Justice) who said that the expenditures for booklets promoting passage of the issue were illegal and beyond the board's powers, but that the issue was moot because the election had already passed. In that case, the parties conceded at oral argument that the actions under attack, if improper, would not suffice to invalidate the election already held, and that therefore the issue was moot. 98 A.2d at 676. Apparently, a refund or repayment was not sought in that action. Nevertheless, the court found the issue important enough to comment as follows:
[T]he board made use of public funds to advocate one side only of the controversial question without affording the dissenters the opportunity by means of that financed medium to present their side, and thus imperilled the propriety of the entire expenditure. The public funds entrusted to the board belong equally to the proponents and opponents of the proposition, and the use of the funds to finance not the presentation of facts merely but also arguments to persuade the voters that only one side has merit, gives the dissenters just cause for complaint.
98 A.2d at 677.
The opinion also referred to the seminal California case dealing with expenditures of public funds on ballot measures, Mines v. Del Valle, 201 Cal. 273, 257 P. 530 (1927), overruled in part on other grounds, Stanson v. Mott, 17 Cal.3d 206, 551 P.2d 1, 130 Cal. Rptr. 697 (1976). In that case, the court found that the use of public funds to further a bond issue was illegal unless the power to do so had been given to the governmental agency expending the funds in clear, unequivocal language. The court found that such power had not been given to the board.
It must be conceded that the electors of said city opposing said bond issue had an equal right to and interest in the funds in said power fund as those who favored said bonds. To use said public funds to advocate the adoption of a proposition which was opposed by a large number of said electors would be manifestly unfair and unjust to the rights of said last-named electors, and the action of the board of public service commissioners in so doing cannot be sustained, unless the *154 power to do so is given to said board in clear and unmistakable language.
257 P. at 537.
In Stanson v. Mott, the Supreme Court of California held that the Department of Parks and Recreation had authority to disseminate information about a bond election, but could not expend public funds to promote the issue, notwithstanding legislative approval of placing the bond act on the ballot. The court said that executive officials were not free to spend public funds for any "public purpose" they may choose, but must utilize appropriated funds in accordance with the legislatively designated purpose. That case involved funds appropriated for specified purposes, which did not provide for campaign expenses. Although this approach is more restrictive than required in the present case, Stanson contains general language which we consider pertinent:
A fundamental precept of this nation's democratic electoral process is that the government may not `take sides' in election contests or bestow an unfair advantage on one of several competing factions. A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office; the selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process.
130 Cal. Rptr. at 705, 551 P.2d at 9 (citations omitted).
A more recent California case is League of Women Voters of California v. Countywide Criminal Justice Coordination Committee, 203 Cal. App.3d 529, 250 Cal. Rptr. 161 (1988). The California appellate court held that the use of public funds to formulate and draft a proposed initiative to reform the criminal justice system and to identify proposed sponsors was not an improper expenditure since it did not amount to a partisan campaign activity. See also Stern v. Kramarsky, 84 Misc.2d 447, 375 N.Y.S.2d 235 (N.Y. Sup. Ct. 1975).
The theme which predominates in these cases, and one which is reinforced by logic and common notions of fair play, is simply stated. While the county not only may but should allocate tax dollars to educate the electorate on the purpose and essential ramifications of referendum items, it must do so fairly and impartially. Expenditures for that purpose may properly be found to be in the public interest. It is never in the public interest, however, to pick up the gauntlet and enter the fray. The funds collected from taxpayers theoretically belong to proponents and opponents of county action alike. To favor one side of any such issue by expending funds obtained from those who do not favor that issue turns government on its head and is the antithesis of the democratic process.
In order to create a special taxing district, government must permit the people to be heard and, in fact, to make the ultimate decision at the ballot box. If government, with its relatively vast financial resources, access to the media and technical know-how, undertakes a campaign to favor or oppose a measure placed on the ballot, then by so doing government undercuts the very fabric which the constitution weaves to prevent government from stifling the voice of the people. An election which takes place in the shadow of omniscient government is a mockery  an exercise in futility  and therefor a sham. The appropriate function of government in connection with an issue placed before the electorate is to enlighten, NOT to proselytize.
We do not mean to imply that Palm Beach County undertook any such blitzkrieg. We address the issue of law only, and not the facts. We therefore make no attempt to pass judgment on each expenditure in question here, nor was the trial court given the opportunity to do so. However, appellees seek to recover for such expenditures as may be found to have been improper. We remand for further appropriate proceedings on this issue should appellees care to pursue it.
Finally, on appeal, appellees challenge the validity of the special act which provided for the creation of a unified health care *155 district. We do not treat this issue or the other issues raised by appellees for the first time in this appellate proceeding.
REVERSED AND REMANDED.
DELL and GUNTHER, JJ., concur.