The Honorable Charles Robinson, CPA, CFE Legislative Auditor 172 State Capitol Little Rock, AR 72201-1099
Dear Mr. Robinson:
You have asked for my opinion on the following questions:
 1. Are the fees, fines, donations, gifts, bequests, or other moneys retained by a county library, and not required to be deposited with the county treasurer, considered public funds and/or funds of the county library?
 2. May a county library contribute funds it maintains from fees, fines, donations, gifts, bequests, or other moneys to a campaign for the purpose of passing a library millage?
You indicate in your request that your audits of several county libraries has disclosed contributions from retained funds to campaigns promoting the passage of library millages, and you seek my opinion on the propriety of such contributions. You further inquire whether such use of retained funds is consistent with the "public purpose doctrine."
RESPONSE
In my opinion, the revenues described in your first question clearly qualify as "public funds." Although finally answering your second question would entail conducting a factual inquiry I am neither authorized nor equipped to undertake, I believe that using retained funds to support a millage campaign may well be impermissible.
Question 1: Are the fees, fines, donations, gifts, bequests, or othermoneys retained by a county library, and not required to be depositedwith the county treasurer, considered public funds and/or funds of thecounty library?
Pursuant to A.C.A. § 13-2-401(d)(1), a county quorum court is authorized to "establish a county library board to conduct the affairs of the county public library or its library services or system in accordance with the law for establishing other county advisory or administrative boards. . . ." Subsection 13-2-404(b)(1) of the Code authorizes a county library board to retain funds of the sort designated in your question:
 Funds received by the county public library by gift, bequest, devise, or donation or from fees or fines may remain in the custody of the county library board, if a board has been created, or deposited with the county treasurer for the county public library fund if the county library board so chooses or if a board has not been created.
 Subsection 13-2-404(b)(2) dictates that funds retained by a library board "be used by it for the establishment, expansion, construction, maintenance, and operation of the county library."
The above recited statutes establish that a library board is a publicly created entity that is charged with handling funds that would have gone directly into the county treasury if the quorum court had not elected to create a board. Moreover, A.C.A. § 13-2-404(b)(2) dictates that all retained funds be used for clearly defined purposes that can only be described as "public" — namely, "the establishment, expansion, construction, maintenance, and operation of the county library." Under these circumstances, I believe the retained funds are clearly "public" in character.[1] Moreover, given its character and functions, a library board is properly characterized as an agency of the county,[2] which qualifies its funds as "public" under the following definition of "public funds":
 As used in this subchapter, "public funds" means, but shall not be limited to, funds of:
* * *
 (2) Any political subdivision of the State of Arkansas, or any agency thereof. . . .
A.C.A. § 19-8-202(2).[3] Accordingly, in my opinion the retained funds are "public funds" to be expended by a county library board in accordance with the purposes set forth at A.C.A. § 13-2-404(b)(2).
Question 2: May a county library contribute funds it maintains fromfees, fines, donations, gifts, bequests, or other moneys to a campaignfor the purpose of passing a library millage?
The initial, possibly dispositive question is whether contributing to a millage campaign violates the catalog of permissible uses of retained funds set forth in A.C.A. § 13-2-404(b)(2) — namely, "the establishment, expansion, construction, maintenance, and operation of the county library." Broadly read, indirect fund-raising in the form of a campaign contribution might qualify as expediting the "expansion" or "operation" of a county library. However, courts have traditionally expressed considerable concern about the expenditure of public funds to support partisan political activities. My predecessor has previously analyzed this concern in the attached Ark. Op. Att'y Gen. No. 98-204:
 Your questions implicate the legality of what has been called" government speech." See Comment, Contemplating the Dilemma of Government as Speaker: Judicially Identified Limits on Government Speech in the Context of Carter v. City of Las Cruces, 27 N.M.L. Rev. 517 (Summer 1997). The legal principles governing the issue are not always clearly defined by the case law. It has been noted that there is almost a "uniform judicial reluctance" to sanction the expenditure of public funds to support partisan election positions. See Stanson v. Mott, 17 Cal.3d 206, 130 Cal.Rptr. 697, 551 P.2d 1, 9 (1976). It has been noted, however, that "[t]he courts struggle, often unsuccessfully, to identify the legal premises" for this reluctance. Burt v. Blumenauer, 299 Or. 55, 699 P.2d 168 (1985). It has been stated that:" A fundamental precept of this nation's democratic electoral process is that the government may not `take sides' in election contests or bestow an unfair advantage on one of several competing factions." Id. At 8. The issue is whether the action of the government is truly partisan, and whether public funds are being expended in connection therewith.
As noted in Opinion 98-204, the underlying issue is whether the public funds are devoted to an appropriate governmental purpose:
 As an initial matter, "when confronting the issue of government partisan advocacy, courts have focused on whether the governmental entity acted within its grant of legislative authority." Comment, supra, at 519. "[C]ourts either find no authority or focus on whether another state statute preempts the authority claimed under a general authorizing provision. . . . The result of this type of inquiry is that, in the absence of express legislative authorization, most courts limit government speech during an election to neutral informational messages." Id. at 519.
Id. The restrictions on the scope of activities of municipalities and their corporate equivalents was recently restated in Burke v. Elmore,341 Ark. 129, 132-33, 14 S.W.3d 872 (2000):
 This court has often stated that municipalities are creatures of the legislature and as such have only the power bestowed upon them by statute or by the Arkansas Constitution. Jones v. American Home Life Ins. Co., 293 Ark. 330, 738 S.W.2d 387 (1987). See also City of Ft. Smith v. O.K. Foods, Inc., 293 Ark. 379, 738 S.W.2d 96 (1987); City of Little Rock v. Cash, 277 Ark. 494, 644 S.W.2d 229 (1982). Additionally, this court has held that any substantial doubt concerning the existence of a power in a municipal corporation must be resolved against the City. Recently, this court summarized what powers can be exercised by a municipality:
 Cities have no inherent powers and can exercise only (1) those expressly given them by the state through the constitution or by legislative grant, (2) those necessarily implied for the purposes of, or incident to, these express powers and (3) those indispensable (not merely convenient) to their objects and purposes.
 Cosgrove v. City of West Memphis, 327 Ark. 324, 326, 938 S.W.2d 827, 828 (1997).
The Supreme Court has echoed these principles in considering the scope of a county agency's authority:
 ". . . Moreover, to authorize the supplying of a power by implication, inference, or presumption of intention, it is not sufficient that the act is advantageous or convenient to the major power conferred, or even effectual in the exercise of it. The power to be supplied by such process must be practically indispensable and essential in order to execute the power actually conferred.
* * *
 ["]A statute will not be extended to include situations by implication when the language of the statute is specific and not subject to reasonable doubt. . . ."
Carter v. Clausen, 263 Ark. 344, 347, 565 S.W.2d 17 (1978), quoting Sutherland, Statutes Statutory Construction, 55.03 (Sands 4th ed. 1973). As I noted in response to your first question, the purposes set forth at A.C.A. § 13-2-404(b)(2) do not expressly include contributing public funds to a partisan measure, and I do not believe such contributions can be justified either by necessary implication or as "indispensable" to the "objects and purposes" of a library.
Moreover, although the theoretical foundation for objecting to the partisan use of public funds is often hard to articulate, various courts have suggested that the offense of using public funds to "take sides" in a public debate is one of constitutional proportions. For instance, inPutter v. Montpelier Public School System, 697 A.2d 354, 358 (Vt. 1997), the court offered the following remarks:
 Although not before us, plaintiff's assertion that the federal Constitution prohibits governmental entities from spending public funds to promote partisan positions in election campaigns finds support in a number of judicial authorities. See Alabama Libertarian Party v. City of Birmingham, 694 F.Supp. 814, 816-21 (N.D.Ala. 1988); Mountain States Legal Found. v. Denver Sch. Dist., 459 F.Supp. 357, 360 (D.Colo. 1978); Stanson v. Mott, 17 Cal.3d 206, 130 Cal.Rptr. 697, 704-05, 551 P.2d 1, 8-9 (1976); see generally Carter v. City of Las Cruces, 121 N.M. 580, 915 P.2d 336, 338-39 (Ct.App. 1996) (collecting cases). Several respected commentators have also explored the question of whether official "partisanship" through the act of disseminating campaign literature violates the constitutional rights of those opposed to the government's position. See S. Shiffrin, Government Speech, 27 U.C.L.A. L.Rev. 565 (1980); M. Yudof, When Governments Speak: Toward A Theory of Government Expression and the First Amendment, 57 Tex. L.Rev. 863 (1979); E. Ziegler, Government Speech and the Constitution: The Limits of Official Partisanship, 21 B.C. L.Rev. 578 (1980).
In Stanson, this constitutional concern prompted the court to disapprove expenditures by the Director of the State Department of Parks and Recreation to promote a bond measure — a fact situation that closely resembles the one in this case.
The nature of the inquiry to be conducted in a case of this sort is aptly summarized in Burt:
 In Citizens to Protect Public Funds v. Board of Education, 13 N.J. 172, 98 A.2d 673 (1953), the New Jersey Supreme Court found implied power for the school board to expend funds to publish an informational booklet about a bond proposal requiring voter approval. The court interpreted the school board's authority more broadly than older cases had done. Nonetheless, the expenditure was held unlawful because the school board had presented only one side of the issue, thereby shutting out those with dissenting views. In the court's words:
 "* * * the board made use of public funds to advocate one side only of the controversial question without affording the dissenters the opportunity by means of that financed medium to present their side, and thus imperiled the propriety of the entire expenditure. The public funds entrusted to the board belong equally to the proponents and opponents of the proposition, and the use of the funds to finance not the presentation of facts merely but also arguments to persuade the voters that only one side has merit, gives the dissenters just cause for complaint." 13 N.J. at 180-81, 98 A.2d 673.
699 P.2d at 171-72. See also Stern v. Kramarsky, 375 N.Y.S.2d 235, 239
(N.Y.Sup.Ct. 1975 (prohibiting agency from "advocat[ing] their favored position on any issue"); Miller v. Miller, 151 Cal. Rptr. 762 (1978) (defining the issue as being whether the challenged activities are "informational" or "promotional"); Colorado Taxpayers Union, Inc. v.Romer, 750 F. Supp. 1041 (D. Col. 1990) (no First Amendment violation unless challenged use of public funds designed to defeat proposed amendment); Palm Beach County v. Hudspeth, 540 So.2d 147 (Fla.App. 1989) (although a county not only may but should allocate tax dollars to educate the electorate on purpose and implications of referendum items, it must do so fairly and impartially). Applying these principles, if the millage campaign were designed to advocate one side of the issue, as opposed to providing potential voters with content-neutral information upon which to base their decisions, I believe the contributions would be impermissible. However, making this determination would entail a factual inquiry I am neither equipped nor authorized to undertake.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP/JHD:cyh
Enclosure
[1] You remark in your request that "the nature of these funds appears to be `public' in nature and should be subject to the `public purpose doctrine.'" My predecessor discussed the general scope of the public purpose doctrine in Ark. Op. Att'y Gen. No. 91-410:
 [Th]e broad, but often difficult to define "public purpose" doctrine . . . generally requires that the expenditure of public funds be for a "public purpose." See generally Chandler v. Board of Trustees of the Teacher Retirement System of the State of Arkansas, 236 Ark. 256, 365 S.W.2d 497 (1963), and cf. specifically South Carolina Op. Att'y. Gen. issued April 24, 1987. It has been stated as regards this doctrine that "[n]o expenditure can be allowed legally except in a clear case where it appears that the welfare of the community and its inhabitants is involved and direct benefit results to the public." McQuillin, Municipal Corporations, § 12, 190. The determination of whether a particular expenditure is for a "public purpose" is to be made by the legislature. Although ultimately the propriety of a particular expenditure is resolved by the judiciary, great weight must be given legislative declarations of public purposes. Turner v. Woodruff, 286 Ark. 66, 698 S.W.2d 527 (1985).
In the present case, I do not believe the public purpose doctrine applies. Rather than broadly declaring that a library board must use retained funds for a public purpose, the legislature has itemized in A.C.A. § 13-2-404(b)(2) a series of specific uses to which the funds may be put. Consequently, it would be impermissible to put the retained funds to any divergent use, whether public or private.
[2] Subsection 14-14-705(2)(E) of the Code identifies a county library board as an "administrative board." Subsection 14-14-705(2)(A) further declares any administrative board "a body politic and corporate," to be considered "an agency of the county government" that will "occupy the same status as a county" in tort actions.
[3] The term "public funds" is regularly used without definition in the Code. "Public funds" is variably defined at A.C.A. §§ 6-85-105, 19-8-101,19-8-202 and 19-11-203(20). The least specialized of these definitions appears at A.C.A. § 19-8-101, under the general provisions of the chapter captioned "Depositories for Public Funds": "As used in §§19-8-101—19-8-107, unless the context otherwise requires, `public funds' or `funds' means any and all kinds of funds handled by treasurers, collectors, commissioners, sheriffs, and clerks." Possibly more expansive is the definition set forth at A.C.A. § 19-8-202, contained in the subchapter captioned "Securities for Deposits":
As used in this subchapter, "public funds" means, but shall not be limited to, funds of:
 (1) The State of Arkansas, or any agency, department, board, commission, or instrumentality thereof;
 (2) Any political subdivision of the State of Arkansas, or any agency thereof,
(3) Any school board or school district;
(4) Any improvement or other taxing or assessing district; and
 (5) Any public corporation or authority created by or recognized by the State of Arkansas, or any political subdivision thereof.
Apparently more narrow is the definition set forth at A.C.A. §19-11-203(20), contained within the Arkansas Purchasing Law:
 "Public funds" means all state-appropriated and cash funds of state agencies, as defined by applicable law or official ruling. Public funds for purposes of this subchapter shall not include funds administered by, or under the control of, agencies, except public funds. Without necessarily being limited thereto, it does not include grants, donations, research contracts, and revenues derived from self-supporting enterprises which are not operated as a primary function of the agency, no part of which funds are deposited in the State Treasury.
Whatever the differences among these definitions, in this instance the legislature has decreed that retained revenues be put exclusively to the recited public uses, which in my opinion clearly renders them "public funds."